[No. B104533. Second Dist., Div. Seven. Nov. 5, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCISCO J. SANCHEZ, Defendant and Appellant.

COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Robert Carl Schneider and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WOODS, J.—A jury convicted appellant, Francisco J. Sanchez, of first degree murder. He appeals his conviction contending the trial court erred in failing to advise the jurors of their power to nullify the verdict and coerced the verdict by warning that any juror who could not follow the law would be excused from the jury. In addition, he claims defense counsel rendered ineffective assistance by failing to object to prejudicial and irrelevant gang evidence. Finally, appellant argues the 1994 revised version of the CALJIC instruction on reasonable doubt was constitutionally flawed.

We hold a trial court is not required to instruct on the jury's power of nullification. We also conclude the appellate record does not affirmatively establish counsel's performance was deficient or that appellant suffered prejudice from counsel's alleged failure to object to admission of gang evidence. We further find the instruction on reasonable doubt is not constitutionally deficient. Accordingly, we affirm the judgment of conviction.

### FACTS AND PROCEEDINGS BELOW

The victim, Jesus Romero, was a professor of Spanish at East Los Angeles Community College. In 1994 he lived alone in a new two-story home in Monterey Park. He regularly drove a friend's red Toyota Camry. His friends and relatives knew him to be homosexual.

In the months preceding his death Romero became depressed and reclusive. Litigation over construction defects in his home made him even more depressed. He used rock cocaine. Members of the State Street Locos (SSL) gang often supplied him with drugs. He frequently allowed them to have parties at his house and spend the night. During this time Romero's sister became concerned about Romero's deteriorating condition. She took the liberty of photocopying credit cards and other documents Romero kept in his wallet in the event she needed to seek a conservatorship for him.

On Monday, October 3, 1994, Alejandro "Alex" Almarez, whose SSL gang nickname was "Bullet," and Alfredo Flores, whose SSL gang nickname was "Pony," visited Romero's home accompanied by two women. Appellant is also an SSL gang member. His gang nickname is "Scooby." Around midnight appellant arrived at Romero's home to join his friends. Romero refused him entrance and told him to leave. Several months before Romero caught appellant attempting to steal a bottle of his Remy Martin cognac and made him put it back. A few weeks before Romero noticed $200 in cash was missing and accused appellant of taking his money. Romero became angry and ordered appellant out of his home.

Flores, Almarez and the two women spent the night at Romero's home in the two bedrooms downstairs. They left the following morning, October 4, 1994. As they left Romero called out to them from his upstairs bedroom and told them "good-bye" and to "take it easy."

On Wednesday, October 5, 1994, Ms. Cynthia Manchaca left her house to go to work at 5:30 a.m. She lived on Topaz Street in Los Angeles. She saw a red Toyota Camry parked across from her house near a school parking structure. The car was not there the night before.

Appellant's girlfriend lived a few blocks away from Topaz Street on Amethyst Street.

At approximately 10:30 p.m. on Friday, October 7, 1994, Ms. Manchaca looked out her window and saw a white Nissan station wagon pull up to the red Toyota Camry still parked across the street. Three Hispanic men got out of the white car and put things into the backseat of the red Toyota.

Appellant's father owned a white Nissan station wagon. Months later Ms. Manchaca identified a photo of appellant as resembling the driver of the white Nissan.

Meanwhile, on Wednesday, October 5, 1994, appellant went to Auto Trenz in Montebello. The store sells and installs auto alarms and stereos. Steven and Maria Villescas owned the store and operated it with the assistance of Edgar Ruiz. Appellant had two of Romero's credit cards. He told Ruiz he wanted to buy "some really good stuff," "anything." Gang members regularly patronize the store but it was very unusual for gang members to have or use credit cards. Neither of the Villescases had yet arrived at the store and Ruiz attempted to reach them by telephone. While Ruiz was on the telephone appellant walked behind the counter and operated the credit card authorization machine himself. Ruiz asked appellant how he

got the credit cards. Appellant replied they belonged to "some man" who "wouldn't know" "because he was dead." Appellant told Ruiz he had "smoked" the man and had his body.

By the time Steven Villescas arrived at the store appellant had already processed two credit card receipts for $500 each. Appellant told Villescas the owner of the cards would not know because he got them from "some fool he smoked last night." Appellant bragged to Villescas, "Yeah, I smoked him and dumped the body down by my pad."

Villescas knew something was the matter because gang members always paid in cash. On occasion they paid Ruiz in drugs for installation work but they always paid Villescas in cash. Ruiz and Villescas told appellant he would have to wait three days for the credit to clear before he could pick up his merchandise. Appellant agreed to wait and said he would be back on Friday. Appellant left the store and drove away in a white Nissan station wagon. Villescas did not call police because he did not want to get involved. In addition, he was "afraid of what might happen." Instead, Maria Villescas, who did the bookkeeping for Auto Trenz, voided the credit transactions.

Later in the day on Wednesday, October 5, 1994, someone used Romero's credit card at Family Discount Shoes located at Sixth and Broadway Streets in Los Angeles.

On Friday, October 7, 1994, appellant learned the charges he made at Auto Trenz did not clear. He went to Auto Trenz with some friends to retrieve the receipts. The Villescases and Ruiz told him there were none. Both Maria and Steven Villescas overheard appellant tell his friend he got the credit cards "from some fool he smoked."

On Saturday, October 8, 1994, Romero's sister let herself into Romero's home with her key. She instantly knew something was wrong. Romero was a fastidious person who loved his pets. She saw trash lying everywhere downstairs. She found one of Romero's dogs locked in a closet. She found Romero's wallet empty and open lying on the kitchen counter. She thought her brother might be dead and called police. Police found Romero's other dog lying dead in another downstairs bathroom. They did not find Romero. Police helped Romero's sister file a missing person report.

On Sunday, October 9, 1994, Mr. and Mrs. Manchaca and one of their neighbors on Topaz Street noticed a foul odor and blood coming from the red Toyota Camry which was still parked across the street. Police found Romero's decomposing body wrapped in a carpet stuffed into the trunk of

the car. In the backseat of the car police found blankets, an answering machine, cassette tapes and eyeglasses. Romero's housekeeper identified these items as having been taken from Romero's home.

An autopsy confirmed Romero died from a single gunshot wound. The bullet entered the back of his head and exited through his neck.

Police officers returned to Romero's house with Romero's sister. Criminologists found bloodstains and blood smears in the downstairs bedroom and adjoining bathroom. It appeared someone had attempted to clean up the bloodstains. Police found drag marks leading from the downstairs guest bedroom, across the living room hardwood floor, and to the garage. The criminologists found traces of blood in the marks in the hardwood floor. Criminologists found no blood evidence upstairs.

Police brought Romero's housekeeper to Romero's house. She identified specific items missing from the home: a VCR, stereo speakers, a telephone answering machine, pictures, and a rug, sheets and blankets from the downstairs guest bedroom. She identified the rug, blankets and answering machine found with Romero's body as the items taken from the downstairs guest bedroom.

Police found no evidence of forced entry. They found a spare key lying on the garage floor.

Romero's sister gave police her photocopies of Romero's credit cards and critical documents. On November 1, 1994, detectives went to Auto Trenz to investigate who had used Romero's credit cards at the store. They showed Mr. Villescas photographs. He told the detectives he did not recognize anyone in the photos. "Taco Man," an SSL member, was in the store and overheard Villescas's conversation with the detectives. When the detective left he told Villescas, "You better not say nothing about that shit because you guys are going to get in a lot of trouble."

The detectives returned later that day to request the credit card receipts. Mr. Villescas was alone. He told the detectives he had not been truthful before and told them all he knew about the situation. He identified appellant as the person using Romero's credit cards. Later Mrs. Villescas and Ruiz similarly identified appellant as the person claiming to have killed Romero and as the one using his credit cards.

After appellant's arrest Mr. Villescas went to the East Los Angeles sheriff's station to meet with appellant's defense counsel and defense

investigator. Two days later, "Rebel," an SSL member, came to Villescas's home. Villescas was very surprised because he believed no one knew where he lived. Villescas was even more surprised when Rebel inquired whether Villescas wanted to sell a car Villescas thought no one even knew he owned.

The next morning a car with several SSL members drove up to Villescas's house. They honked the horn and yelled out Villescas's name for three or four minutes. Villescas did not go outside and they finally drove off.

A few days later the Villescases returned home to find "SSL" scrawled on their front door. Shortly thereafter the Villescases moved to a different residence and closed their Auto Trenz business.

Detectives first interviewed appellant's girlfriend, April Gomez, at her home. While there the detectives retrieved numerous letters appellant wrote to her while in jail. The detectives continued their interview of April at the police station. The interview was tape-recorded and transcribed for use by the jury. Gomez told them appellant explained the murder to her as follows: He went to Romero's home with Pony, Bullet, and two other "heads" to rob Romero of $10,000 in order to get bail money for "Blacky," appellant's cousin. They knew Romero had money because he purchased drugs from them. The group entered the house. Pony and Bullet went upstairs to talk with Romero. Appellant and the others waited in the living room. Appellant heard a shot. Pony and Bullet told the others they shot Romero. They dragged the body downstairs in a carpet and placed it in the trunk of Romero's car. They put one dog in the closet and the other in the bathroom. They later returned to the house to take things.

In one of the letters appellant sent to April Gomez he said, "I know I have to go through all this process and it will have to take a while, but please, April, be patient with me. Don't give up on me, okay? Don't blame yourself for anything. You never pushed me into going with my friends. It was my fault for going down there when I could have been with you."

In another letter appellant writes, "I fucked up by going back down there when I started to do good. I had everything. I had a job, I had a very loving and supporting girlfriend, but I think God wants to punish me for all the things I have done in the past by taking all these good things from me."

In a later letter appellant asked April to provide an alibi for him. He states, "Are you going to my court on the 29th? My investigator needs to talk to you. Get in touch with him, okay? If he asks you, I was on the 3rd of October last year [sic], tell him we were celebrating one month anniversary

[*sic*], and if he asks where I was on the 4th, I was at home, okay? Please remember this, and if he asks us when did I break my leg, it was on the 5th. Please remember this. [¶] If he asks you where we were on the 3d, tell him my house, okay? Please. I'm counting on you."

In another letter appellant tells April: "I talked to my cousin Blacky. He told me not to worry that everything is handled with the fools from store and with Pony. What I told you right now, keep it to yourself, don't tell nobody. I mean it." In a later letter appellant further explains, "I expect for you to take me serious. This is not a joke. I'm here for something serious and which I could spend the rest of my life locked up. [¶] I talked to my cousin. He said he took care of Pony and the guys at the store, so I pray now that I get out."

The district attorney charged appellant with one count of murder (Pen. Code, § 187, subd. (a)) while personally using a firearm (Pen. Code, § 12022.5, subd. (a)). The prosecution's theory at trial was a combination of premeditated, deliberate and willful murder, felony murder based on robbery and felony murder based on burglary. In the alternative, the prosecutor also argued appellant could be convicted of first degree murder as an aider and abettor to the murder on any of these theories. The jury convicted appellant of first degree murder.[1] However, the jury found the gun use allegation not true. The trial court sentenced appellant to state prison for 25 years to life.

## DISCUSSION

### I. *The Trial Court Did Not Err in Failing to Instruct the Jurors They Were Free to Find Appellant Had Committed Robbery Yet Convict Him of Only Second Degree Murder.*

During their second full day of deliberations the jury sent the court two questions regarding felony murder. The first note inquired, "If we agree that it was a robbery and we agreed a murder took place during the robbery, does that mean it is automatically first degree murder?" The trial court told the jurors, "The answer to that is yes. Murder taking place during the commission or attempted commission of robbery is murder, automatically murder of the first degree." Appellant does not disagree with the court's response to this question.

The jury's second question asked, "Can we arrive at a verdict where we find the defendant guilty of robbery/2d degree murder?" The trial court

---

[1]Appellant's first jury could not reach a verdict and the trial court declared a mistrial. Appellant's second trial began a little over 30 days later before the same trial court and with the same counsel.

explained, "I read that question as being robbery-murder but murder resulting in second degree. [¶] The answer to that is no. To begin with, robbery is not charged so you wouldn't find the defendant guilty of robbery at all or not guilty of robbery. The only issue is whether the defendant is guilty of murder, and, if so, what degree, and if guilty of murder whether he personally—whether he used a firearm in the commission of the murder."

The trial court then explained the concept of felony murder and gave various examples to illustrate the concept in practice.

The trial court concluded its answer, stating, "So that's an explanation for [*sic*] the law. I did ask each of you during the jury selection process if you would be willing to follow the law even if you disagree with it. Now I've explained the reason for the felony murder rule and if after thinking about it any of you feel that if you did find the defendant committed a robbery and in the commission or attempted commission of it he committed a murder and are reluctant to follow the law to tell me, and I'll excuse you from jury service because you're not following the law.

"You have to decide the facts. The law is given to you and you apply the law to those facts. If you can't do what you told me you were going to do, which is follow the law, then I will excuse you from jury service.

"It's a tough situation to be in perhaps, but you've been asked only to find the facts, not to change the law, not to change the facts to fit the law that you would like it to be, but to follow the law after you determine what the facts are."

It is the court's response to this question with which appellant takes issue. He claims the court should have simply answered "yes." He argues it was error for the trial court to instruct the jury they "must find appellant guilty of first degree murder and could not nullify what it considered to be an unjust law . . ." and threatening to remove any juror who could not follow the law. The People respond that instead of being coercive, the court's comments indicate its understanding and sympathy with the jurors and made it clear none of them would be forced to render a verdict against their consciences.

A jury's power to nullify a verdict has been a part of the Anglo-American common law heritage since *Bushell's Case* (1670) 124 Eng.Rep. 1006 which freed the jurors who had acquitted William Penn and William Mead of unlawful assembly. The decision repudiated the power of courts to punish jurors for reaching legally erroneous verdicts.

On the other hand, as appellant acknowledges, no court has held a trial court must instruct a jury on its power of nullification. (See, e.g., *People* v.

*Partner* (1986) 180 Cal.App.3d 178, 186 [225 Cal.Rptr. 502] ["We agree that the jury should not be instructed on so-called jury nullification."]; *People* v. *Gottman* (1976) 64 Cal.App.3d 775, 781 [134 Cal.Rptr. 834] [". . . a trial court is under no duty, nor is it proper, to advise a jury concerning their power, as distinguished from their right, to return an unwarranted verdict or other factual finding."]; *People* v. *Fernandez* (1994) 26 Cal.App.4th 710, 712 [31 Cal.Rptr.2d 677] ["[W]e hold that the trial court did not have to advise the jury of its power to nullify a verdict . . . ."]; *People* v. *Baca* (1996) 48 Cal.App.4th 1703, 1704-1705 [56 Cal.Rptr.2d 445] [". . . we join other California courts in rejecting the claim that a defendant is entitled to have the jury instructed on the doctrine of nullification."]; *United States* v. *Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1137 [154 App.D.C. 76] ["An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal structure requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny."].)

Nevertheless, appellant suggests the trial court should have at least given the instruction the trial court gave in *People* v. *Partner*, *supra*, 180 Cal.App.3d 178. Partner's jury inquired, " 'Can we have robbery and murder in the second degree?' " In *Partner* the trial court responded in the affirmative, provided, the jury found the murder did not occur during the commission or attempted commission of the robbery. (180 Cal.App.3d at p. 185.) The situation in the *Partner* case is distinguishable from the case at bar. Unlike the present case, in *Partner* the defendant was separately charged with robbery. This crucial difference justified the alternative response to the jurors' question. Here it would have only caused confusion because appellant was not charged with robbery, and a conviction of robbery was not an option for the jury.

Citing Justice Kaus's concurring opinion in favor of a nullification instruction in *People* v. *Dillon* (1983) 34 Cal.3d 441, 490-493 [194 Cal.Rptr. 390, 668 P.2d 697], appellant contends that at a minimum the trial court should have "informed the jury of (1) its power to render a verdict more lenient than the facts justify, and (2) its immunity from punishment if it chooses to exercise that power." (34 Cal.3d at p. 491, fn. 2.) However, this suggestion was expressly rejected by the *Dillon* majority. In response, Justice Mosk, writing for the majority stated, "The separate opinion of Justice Kaus offers an additional reason for the result reached in this opinion. But his route—whether described as nullification or civil disobedience—impliedly reopens the classic debate as to whether society has created courts of law or courts of justice. Whatever the result of that exercise, it cannot seriously be urged that, when asked by the jurors, a trial court must advise them: 'I have instructed you on the law applicable to this case. Follow it or ignore it, as you choose.' Such advice may achieve pragmatic justice in

isolated instances, but we suggest the more likely result is anarchy." (34 Cal.3d at pp. 487-488, fn. 39; see also *People* v. *Powell* (1949) 34 Cal.2d 196, 205, fn. 2 [208 P.2d 974] [a jury rendering a general verdict in a criminal case " 'necessarily has the naked *power* to decide all the questions arising on the general issue of not guilty; but it only has the right to find the facts, and apply them to the law as given by the court.' "].)

As an intermediate appellate court, we are bound by the decisions of our state's highest court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Accordingly, we are bound to conclude the trial court was not required to instruct the jurors on their power of nullification and permit them to disregard the law.[2]

## II. *Appellant Has Failed to Affirmatively Establish He Received Ineffective Assistance by Counsel's Failure to Object to the Introduction of Gang Evidence.*

 Appellant argues gang evidence was irrelevant to prove any disputed issue at trial. He points out there was no evidence the murder was gang related or gang motivated. In addition, he argues the fact of his gang membership was not used to prove his identity or any other issue. He contends that to the extent gang evidence had any relevance, its probative

---

[2]The dissent criticizes the trial court for its answer to the jury's question, an answer that was direct, accurate, and easily understood. Instead of this answer, the dissent suggests the trial court should have told the jury to reread CALJIC No. 1.00 (which instructs them they "must accept and follow the law . . . whether or not you agree with the law") or to just reread all the instructions.

We fail to see the advantage of trial court coyness, evasiveness, or obtuseness when responding to a jury's request for assistance. (The dissent characterizes its suggested trial court deflection "A direct and unembellished response." (Dis. opn., *post*, at p. 1456).)

The dissent also creates a straw man, asserting the trial court "told the jurors *they did not have the power* or right of nullification to return a verdict on a lesser charge than permitted by the facts and the law." (Dis. opn., *post*, at p. 1456, italics added.) Of course, the trial court said no such thing: the jury did not ask about their *power* and the trial court did not comment on their *power*.

The dissent creates a second straw man. It states the trial court "informed the jurors they would be *sanctioned . . . if they did not adhere to the court's instructions [on the law]*." (Dis. opn. *post*, at p. 1456, italics added.) Of course, the trial court said no such thing.

What the trial court did say was, "tell me [if you are reluctant to follow the law] and I'll excuse you from jury service because you're not following the law." This is what a trial court is duty bound to do. (*People* v. *Collins* (1976) 17 Cal.3d 687, 695-696 [131 Cal.Rptr. 782, 552 P.2d 742]; *People* v. *Williams* (1996) 46 Cal.App.4th 1767, 1780 [54 Cal.Rptr.2d 521]; see generally, *People* v. *Halsey* (1993) 12 Cal.App.4th 885, 892-893 [16 Cal.Rptr.2d 47].)

Contrary to the dissent's assertion, the trial court did not intimate any postverdict investigation into jury deliberations nor threaten postverdict juror punishment.

We believe it fair to ask how the dissent would regard jury nullification *against* the accused. Suppose a juror asked: Do I have the *power* to convict even if I'm not convinced of guilt beyond a reasonable doubt?

Justice Mosk was right in *Dillon*; the path of nullification leads to anarchy.

value was substantially outweighed by its potential for prejudice and therefore a properly made motion under Evidence Code section 352 to preclude gang references would have been granted. He argues that because defense counsel failed to object to any of the gang evidence or references, he received ineffective assistance at trial.

■ "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. (E.g., *Strickland* v. *Washington* (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692, 104 S.Ct. 2052, 2063] [discussing federal constitutional rights]; *People* v. *Pope* [(1979)] 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] [discussing both state and federal constitutional rights].) The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result. (See, e.g., *Strickland, supra,* at pp. 684-687 [80 L.Ed.2d at pp. 691-693, 104 S.Ct. at pp. 2063-2064]; *Pope, supra,* 23 Cal.3d at pp. 423-425.)" (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].)

" 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' " (*People* v. *Wharton* (1991) 53 Cal.3d 522, 575 [280 Cal.Rptr. 631, 809 P.2d 290], quoting *People* v. *Ledesma, supra,* 43 Cal.3d 171, 215, italics in original.) It is defendant's burden to demonstrate the inadequacy of trial counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) The Supreme Court has summarized defendant's burden as follows: " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 793, 104 S.Ct. 2052]; *Pope, supra,* 23 Cal.3d at pp. 423-425.) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland, supra,* at pp. 691-692 [80 L.Ed.2d at pp. 695-696].) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833 [21 Cal.Rptr.2d 373, 855 P.2d 391].)

■ "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (see *People* v. *Wright* (1990) 52 Cal.3d 367, 412 [276 Cal.Rptr. 731, 802 P.2d 221]), and there is a 'strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance.' (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694, 104 S.Ct. 2052] (*Strickland*).) Defendant's burden is difficult to carry on direct appeal, as [the Supreme Court has] observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel *only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.*" ' (*People* v. *Zapien* (1993) 4 Cal.4th 929, 980 [17 Cal.Rptr.2d 122, 846 P.2d 704].)" (*People* v. *Lucas* (1995) 12 Cal.4th 415, 436-437 [48 Cal.Rptr.2d 525, 907 P.2d 373], italics added.)

 A review of the record on appeal confirms defense counsel made no record objections to the admission of gang evidence. We nevertheless conclude appellant cannot succeed on his claim of ineffective assistance because the record on appeal does not affirmatively establish counsel's performance was deficient. In other words, this is not a situation where " 'there simply could be no satisfactory explanation' " for counsel's act or omission. (*People* v. *Ledesma, supra,* 43 Cal.3d at p. 218.) To the contrary. The record suggests a more than adequate explanation for counsel's omission.

The present trial began only 36 days after the trial court declared a mistrial in appellant's first trial. At the second trial the same deputy district attorney represented the People—Thomas O'Brien. The same defense counsel represented appellant—Alternate Public Defender Pat Thomason. The same trial judge—William R. Pounders—also presided at the second trial. From the very start it was apparent the parties reached an agreement to proceed with essentially the same witnesses, evidence, argument and instructions. The parties may well have also agreed not to repeat objections and arguments made to, and rejected by, the same trial court a mere month before. Or assuming counsel would not voluntarily agree to such an arrangement, it is possible the trial court made it clear it would not entertain renewed motions and objections concerning matters on which it had already ruled.

The record strongly suggests these possibilities because an obvious exception to any such agreement was with regard to new evidence or new witnesses. In these instances counsel made, and the trial court entertained, objections and arguments concerning each issue raised for the first time in the second trial. For example, appellant's girlfriend, April Gomez, was not interviewed until after the first trial. Consequently, her tape-recorded police interview was not introduced at the first trial. Nor were appellant's letters, which raised for the first time the issue of suborning perjury. These new issues required lengthy discussions regarding proper jury instructions and whether the People would be permitted to amend the information to add special circumstance allegations.

But even in the unlikely scenario counsel in fact had no tactical reason for failing to object to the gang evidence, we conclude appellant cannot demonstrate prejudice from counsel's alleged omission.

California courts have long recognized the potential prejudicial effect of gang evidence. However, they have admitted such evidence when the very reason for the crime, usually murder, is gang related. (See, e.g., *People* v. *Manson* (1976) 61 Cal.App.3d 102 [132 Cal.Rptr. 265] [motive for murders]; *In re Darrell T.* (1979) 90 Cal.App.3d 325, 328-334 [153 Cal.Rptr. 261] [motive]; *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 194 [113 Cal.Rptr. 254] [motive]; *People* v. *Frausto* (1982) 135 Cal.App.3d 129 [185 Cal.Rptr. 314] [motive and intent].) Evidence of gang membership has also been admitted to prove bias, provided it is not cumulative to other properly admitted and less inflammatory evidence. (See, e.g., *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-905 [184 Cal.Rptr. 165, 647 P.2d 569]; *People* v. *Maestas* (1993) 20 Cal.App.4th 1482, 1497-1498 [25 Cal.Rptr.2d 644].)

Due to its potential prejudicial impact on a jury, our Supreme Court has condemned the introduction of "evidence of gang membership if only tangentially relevant, given its highly inflammatory impact." (*People* v. *Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351].) Gang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. (Evid. Code, § 1101, subd. (a); *People* v. *Perez* (1981) 114 Cal.App.3d 470, 477-478 [170 Cal.Rptr. 619].) Such evidence is only admissible when it is logically relevant to some material issue at trial other than character trait evidence. (*Ibid.*)

We agree with appellant there was no evidence that the motive for the murder was in any way gang related. We also agree evidence that he was a member of SSL had only limited probative value to corroborate the witnesses' identification of him as the person using Romero's credit cards and as the person claiming to have killed him. Evidence of his gang membership was cumulative to other, less inflammatory evidence of identification. Ruiz had seen appellant before. Ruiz and the Villescases identified appellant from photographs. Ms. Manchaca identified appellant as the driver of the white Nissan and as one of the three Hispanic males loading things into the backseat of Romero's car.

Nevertheless, the evidence was properly admissible on the issue of witness credibility. ■ " 'Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. (Evid. Code, § 780; *People* v. *Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218].) Testimony a witness is fearful of retaliation similarly relates to

that witness's credibility and is also admissible. (*People* v. *Malone* (1988) 47 Cal.3d 1, 30 [252 Cal.Rptr. 525, 762 P.2d 1249].) It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible. (*People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468] [testimony witness was afraid to go to jail because defendant had friends there relevant to witness's credibility].)' (*People* v. *Gutierrez* (1994) 23 Cal.App.4th 1576, 1587-1588 [28 Cal.Rptr.2d 897].)" (*People* v. *Olguin* (1994) 31 Cal.App.4th 1355, 1368 [37 Cal.Rptr.2d 596].)

Mr. Villescas testified he initially lied to the detectives investigating Romero's murder. Villescas explained he refused to identify appellant in the photo array as the person claiming to have killed Romero and as the person using Romero's credit cards because he knew an SSL member was listening in on the conversation and he "was afraid what might happen." This SSL member warned Villescas and Ruiz not to tell the police anything. or they would "get in a lot of trouble." Several days later SSL members harassed Villescas at his home and attempted to intimidate him. The Villescases finally moved away after discovering SSL gang graffiti scrawled on their door.

SSL members similarly threatened Ruiz, the employee at the Auto Trenz store. Ruiz similarly refused to identify appellant to the detectives as the person claiming to have killed Romero and the person using Romero's credit cards. He explained he lied to the detectives because he was intimidated by the gang member's presence in the store. After the detectives left the SSL member warned him not to talk. Ruiz testified the threat scared him. At the first trial Ruiz admitted he was still scared to testify. Ruiz could not be located to testify at the second trial despite the prosecutor's due diligence. Ruiz was declared unavailable and his former testimony was read to the jury.

In this case it was necessary to discuss gang evidence to explain the meaning of SSL. In addition, the references to the gang were relevant to assist the jury in determining the credibility of the threats from the SSL members, in determining whether the harassment and graffiti should be taken seriously as witness intimidation or whether they constituted nothing more than empty threats. Finally the gang evidence had significant probative value on the issue of these witnesses' credibility to assist the jury in determining when they were in fact telling the truth. As such, this evidence would have been admissible in any event. (*People* v. *Olguin*, *supra*, 31 Cal.App.4th 1355, 1368-1369; *Jammal* v. *Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920 [only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process].)

Consequently, appellant cannot establish his case was prejudiced from defense counsel's alleged omission. (*In re Harris*, *supra*, 5 Cal.4th 813, 832-833.)

III. *The 1994 Revised Instruction on Reasonable Doubt Did Not Violate Appellant's Constitutional Rights.*

■ Appellant contends instructing the jury with the 1994 revision to CALJIC No. 2.90 was error of constitutional dimension because it failed to correctly convey the concept of reasonable doubt to the jury.

In *Victor v. Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583] the United States Supreme Court stated the test for a constitutional instruction on reasonable doubt: ". . . so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, . . . the Constitution does not require any particular form of words to be used in advising the jury of the government's burden of proof. . . . Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.' " (*Id.*, at p. 5 [114 S.Ct. at p. 1243], citations omitted.)

The court in *Victor* opined the terms in California's CALJIC No. 2.90 jury instruction—"moral evidence" and "moral certainty"—may have lost their historical meaning. But the *Victor* court found no constitutional infirmity in the context of the CALJIC No. 2.90 instruction taken as a whole. (511 U.S. at pp. 9-15 [114 S.Ct. at pp. 1244-1248].) "Although . . . moral certainty is ambiguous in the abstract, the rest of the instruction given in [the] case lends content to the phrase. The jurors were told that they must have 'an abiding conviction, to a moral certainty, of the truth of the charge.' . . . An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." (511 U.S. at pp. 14-15 [114 S.Ct. at p. 1247], citation omitted.)

Following the decision in *Victor v. Nebraska*, the California Supreme Court in *People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888], recommended trial courts give the very instruction used in this case. That is, the court recommended trial courts modify former CALJIC No. 2.90 by striking the phrases, " 'and depending on moral evidence' " and " 'to a moral certainty.' " (8 Cal.4th at p. 504.)

In sum, the California Supreme Court has expressly authorized this particular jury instruction on reasonable doubt. As an intermediate appellate court we are bound to follow the decisions of this state's highest court. (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d 450, 455.) Accordingly, we find no error.

DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurrred.

**JOHNSON, J.**—I respectfully dissent.

Before presenting my reasons for dissenting, however, I want to make it crystal clear what I am and am not contending. I am *not* arguing trial courts do or should have a duty to instruct jurors they have the power of jury nullification. That question is well settled, as explained both in the majority opinion and later in this dissent. There clearly is no such duty. What this case presents, however, is the near opposite issue—may the trial judge instruct the jurors they do *not* have that power (even though they do). Both sides agree what the trial judge told these jurors in this case is the functional equivalent of such an instruction. Whether such an instruction is permissible appears to be an issue of first impression in California and quite possibly the United States.

This case also presents a related issue, again of first impression. May the trial court threaten to remove jurors in the midst of deliberations if they engage or propose to engage in jury nullification? Clearly the court is entitled to remove jurors who prior to or during presentation of the evidence indicate an intent to engage in jury nullification just as it could remove jurors who indicate they intend to vote for guilt (or innocence) irrespective of the evidence. Prejudgment is grounds for removal no matter which side prejudgment favors. But if the juror's decision to engage in jury nullification arises during deliberations and on the basis of his or her consideration of the evidence and the total circumstances of the case, may that juror be removed because of an inclination to exercise a power accepted in Anglo-American law for some four centuries? For reasons explained below, I think not.

I agree that in California a trial court need not instruct a jury on their common law right to decide the law, as well as the facts, in a given case and arrive at a verdict which reflects the community conscience, if not the expected result under the law as given by the trial court. However, I also believe an entirely different situation arises when a trial court elects to give an instruction which essentially informs the jury they have neither the right nor the power to disregard the law and render justice in a given case, and which threatens removal from the panel as a sanction if jurors attempt to exercise their power of nullification. Because I conclude such an instruction is contrary to existing law and had the effect of coercing the verdict in this case, I would find the error prejudicial and reverse.

### THE TRIAL COURT'S INSTRUCTION ON THE JURY'S POWER OF NULLIFICATION CONSTITUTED REVERSIBLE ERROR.

During their second full day of deliberations the jury sent the court two questions regarding felony murder. The first note inquired, "If we agree that it was a robbery and we agreed a murder took place during the robbery, does that mean it is automatically first degree murder?" The trial court told

the jurors, "The answer to that is yes. Murder taking place during the commission or attempted commission of robbery is murder, automatically murder of the first degree." No one disputes the propriety of this response.

The jury's second question asked, "Can we arrive at a verdict where we find the defendant guilty of robbery/2d degree murder?" The trial court then instructed the jurors as follows: "I read that question as being robbery-murder but murder resulting in second degree. [¶] The answer to that is no. To begin with, robbery is not charged so you wouldn't find the defendant guilty of robbery at all or not guilty of robbery. The only issue is whether the defendant is guilty of murder, and, if so, what degree, and if guilty of murder whether he personally—whether he used a firearm in the commission of the murder."

The trial court then gave a lengthy explanation of felony murder and offered numerous examples to illustrate the concept in practice.

The trial court concluded its answer, stating, "So that's an explanation for [*sic*] the law. I did ask each of you during the jury selection process if you would be willing to follow the law even if you disagree with it. Now I've explained the reason for the felony murder rule and if after thinking about it any of you feel that if you did find the defendant committed a robbery and in the commission or attempted commission of it he committed a murder and are reluctant to follow the law to *tell me, and I'll excuse you from jury service because you're not following the law*.

"You have to decide the facts. The law is given to you and you apply the law to those facts. *If you can't do what you told me you were going to do, which is follow the law, then I will excuse you from jury service.*

"It's a tough situation to be in perhaps, but you've been asked only to find the facts, not to change the law, not to change the facts to fit the law that you would like it to be, but to follow the law after you determine what the facts are." (Italics added.)

It is the court's response to this question which I believe constituted error. It was contrary to existing law for the trial court to instruct the jury they lacked the power to nullify the verdict. Moreover, the trial court compounded the error by threatening to punish any juror who could not follow the law by removing him or her from the panel.

A California jury in a criminal case is instructed they have the duty to follow the law. (CALJIC No. 1.00.) Nevertheless, a criminal jury has the power to acquit even when their findings as to the facts, if literally applied to the law as stated by the trial court, would have resulted in a conviction. The jury's right to refuse to apply a law perceived to be unjust or unpopular and to render a verdict consistent with their collective conscience is often

referred to as jury nullification. (See 2 LaFave & Israel, Criminal Procedure (1984) Right to Jury Trial, § 21.1(g), pp. 700-702; Gunther, The Jury in America (1988) Jury Justice, p. 219 et seq.)

This practice has solid historical credentials. In 1670, *Bushell's Case* (1670) 124 Eng.Rep. 1006 established the right of a jury to find facts and apply the law to those facts according to their conscience without fear of judicial reprisal. In that case the jurors refused to follow the judge's instructions on the law and were imprisoned after they acquitted William Penn and William Mead of unlawful assembly. The decision in *Bushell's Case* repudiated the power of courts to punish jurors for reaching legally erroneous verdicts.[1]

In the United States the jury was legally empowered to decide both the facts and the law of a case in rendering their verdict during the eighteenth and early nineteenth centuries. However, by the end of the 19th century courts became concerned the law might become " 'as variable as the prejudices, the inclinations, and the passions of men.' " (*Sparf & Hansen* v. *United States* (1895) 156 U.S. 51, 89 [15 S.Ct. 273, 288, 39 L.Ed. 343], quoting G. Worthington, Inquiry Into Power of Juries (1825) p. 193.)[2] By then most jurisdictions chose to follow the contemporary English practice of not instructing the jury on their power to nullify a verdict and of not permitting the matter to be raised in argument to the jury. The role of the jury became restricted to a determination of facts alone. (156 U.S. at pp. 101-102 [15 S.Ct. at p. 293].)

This position has been reaffirmed in a number of federal decisions. (*United States* v. *Dougherty* (D.C. Cir. 1972) 473 F.2d 1113, 1137 [154 App.D.C. 76] ["An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal structure requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny."]; *United States* v. *Boardman* (1st Cir. 1969) 419 F.2d 110, 116; *United States* v. *Moylan* (4th Cir. 1969) 417 F.2d 1002, 1005-1009; *United States* v. *Trujillo* (11th Cir. 1983) 714 F.2d 102, 105-106; see also discussion in Gertner & Mizner, The Law of Juries (1997) Jury Nullification, pp. 6-1 to 6-9.)

California has also adopted the same position. Nevertheless, today's juries retain the power, if not the right, to refuse to follow the substantive rules of

---

[1]For a comprehensive discussion of the historical background of jury nullification see Scheflin, *Jury Nullification: The Right to Say No* (1972) 45 So.Cal.L.Rev. 168.

[2]More recent cases acknowledge that jurors' consciences or shared notions of equity, rather than bias, incompetence, or techniques of persuasion, are largely responsible for extra-legal jury decisions. (See, e.g., *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 156 [88 S.Ct. 1444, 1451, 20 L.Ed.2d 491]; *Williams* v. *Florida* (1970) 399 U.S. 78, 100 [90 S.Ct. 1893, 1905-1906, 26 L.Ed.2d 446]; *United States* v. *Spock* (1st Cir. 1969) 416 F.2d 165, 182; see also Note, *Toward Principles of Jury Equity* (1974) 83 Yale L.J. 1023 and Christie, *Lawful Departures from Legal Rules: "Jury Nullification" and Legitimated Disobedience* (1974) 62 Cal.L.Rev. 1289 [exploring benefits and disadvantages of jury sovereignty].)

law given them by the judge in reaching their verdict. (See, e.g., *People* v. *Lem You* (1893) 97 Cal. 224, 228 [32 P. 11] [a jury rendering a general verdict in a criminal case "necessarily has the naked *power* to decide all the questions arising on the general issue of not guilty; but it only has the right to find the facts, and apply to them the law as given by the court"]; *People* v. *Powell* (1949) 34 Cal.2d 196, 205, fn. 2 [208 P.2d 974] [same]; *People* v. *Gottman* (1976) 64 Cal.App.3d 775, 781 [134 Cal.Rptr. 834] [". . . a trial court is under no duty, nor is it proper, to advise a jury concerning their power, as distinguished from their right, to return an unwarranted verdict or other factual finding."]; *People* v. *Partner* (1986) 180 Cal.App.3d 178, 186 [225 Cal.Rptr. 502] ["We agree that the jury should not be instructed on so-called jury nullification."]; *People* v. *Fernandez* (1994) 26 Cal.App.4th 710, 712 [31 Cal.Rptr.2d 677] ["[W]e hold that the trial court did not have to advise the jury of its power to nullify a verdict . . . ."]; *People* v. *Baca* (1996) 48 Cal.App.4th 1703, 1704-1705 [56 Cal.Rptr.2d 445] [". . . we join other California courts in rejecting the claim that a defendant is entitled to have the jury instructed on the doctrine of nullification."]; *People* v. *Nichols* (1997) 54 Cal.App.4th 21, 24-25 [62 Cal.Rptr.2d 433] [although a jury has the undisputed power to ignore the evidence and the law and to acquit if that is what it chooses to do, the courts have not required trial judges to instruct on that power].)

Several commentators suggest a jury's power of nullification is a part of the right to jury trial guaranteed by the Sixth Amendment. (See, e.g., 2 LaFave & Israel, Criminal Procedure, *supra*, Right to Jury Trial, § 21.1(g), p. 701; Scheflin, *Jury Nullification: The Right to Say No, supra*, 45 So.Cal.L.Rev. 168, 187.) This argument is based on the United States Supreme Court's interpretation of the Sixth Amendment right to jury trial in *Duncan* v. *Louisiana, supra*, 391 U.S. 145. There the court explained "[a] right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. . . . Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence." (391 U.S. at pp. 155-156 [88 S.Ct. at p. 1451].)

Despite this significant aspect of the jury's role in a criminal trial no reported California decision has held a trial court must instruct on its power

of nullification. (See, e.g., 5 Witkin & Epstein, Cal. Criminal Law (2d ed., 1997 pocket supp.) Trial, § 2927, pp. 235-236 and cases collected.) Nevertheless, the trial court in the present case could have responded to the jury's question whether they could find robbery and still return a verdict of second degree murder by rereading CALJIC No. 1.00, which directs the jury to decide the case based on the facts and the law as supplied by the court. Alternatively, the court could have simply instructed the jurors to reread the instructions on their own. (See *People* v. *Fernandez, supra,* 26 Cal.App.4th 710, 713 [court simply answered "no" to jury's question whether they had the option of convicting the defendant of a lesser crime even though they all agreed on the original charge; a better response would have been to reread the instructions to the jury].) Such a response would have been consistent with prevailing legal precedent of restricting the role of a jury to a determination of the facts, and consistent with the requirement of requiring jurors to follow the law. A direct and unembellished response would also not have run afoul of existing precedent holding a trial judge is not required to instruct on a jury's power of nullification.

Instead, the trial court in the present case went well beyond refusing to instruct the jury on their power of nullification. The instruction the court gave affirmatively, unequivocally and erroneously told the jurors they did not have the power or right of nullification to return a verdict on a lesser charge than permitted by the facts and the law. At oral argument the People conceded the court's instruction was the substantial equivalent of an affirmative instruction jury nullification is improper. Indeed, I am aware of no decision, and the People and the majority have cited none, holding an instruction which informs a jury they have no power of nullification is ever an appropriate response to a jury's question on the subject. (Cf. *Horning* v. *District of Columbia* (1920) 254 U.S. 135, 138-139 [41 S.Ct. 53, 54, 65 L.Ed. 185] [although trial court informed the jury the agreed facts established a criminal violation as a matter of law and that they were not free to capriciously ignore the evidence, jurors were still allowed the technical right to decide against the law and the facts].)

The second flaw in the court's instruction is that it informed the jurors they would be sanctioned with removal if they did not adhere to the court's instructions. The trial court unambiguously informed the jury members they would be excused from further service as jurors if they refused to follow the law.[3]

The vice in the court's instruction is not simply its coercive and threatening nature, although this characteristic alone presents its own problems. It

---

[3]We agree with the majority the trial court did not threaten the jurors with *postverdict* punishment. Instead, the court threatened to punish the jurors with removal to prevent them from participating in any decision reached in the case.

was also contrary to established California precedent holding jurors *do* have the power to nullify a verdict (see, e.g., *Powell, Gottman, Partner, Fernandez, Baca, Nichols*). The thrust and purpose of the trial court's instruction was to interfere with the jury's deliberations by prohibiting them from reaching a verdict consistent with their view of the facts, law and equities of the case as is a criminal jury's right. However, it is not permissible for a judge in a criminal trial to interfere in a manner tantamount to directing a verdict against the defendant. (See, e.g., *Horning* v. *District of Columbia, supra,* 254 U.S. 135, 138-139 [41 S.Ct. 53, 54] [the judge in a criminal case cannot direct a verdict and instruct the jury to find the defendant guilty; the jury has the power to decide against the law and the facts].)

Moreover, the court's instruction was contrary to established law that jurors cannot be punished if they choose to exercise their power of nullification. (*Bushell's Case, supra,* 124 Eng.Rep. 1006.) Yet that is what the court proposed to do in this case. Any juror who refused to follow the law would be removed from the panel. Understandably, neither the People nor majority attempt to justify the court's instruction on the ground a jury's collective choice to refuse to follow the law in a given case constitutes the good cause necessary to discharge a juror. (Code Civ. Proc., § 233; cf. *People* v. *Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965] [illness]; *People* v. *Collins* (1976) 17 Cal.3d 687 [131 Cal.Rptr. 782, 552 P.2d 742] [juror emotionally unable to cope with the experience of being a juror]; *People* v. *Green* (1995) 31 Cal.App.4th 1001 [38 Cal.Rptr.2d 401] [bias]; *People* v. *Williams* (1996) 46 Cal.App.4th 1767 [54 Cal.Rptr.2d 521] [inability to comprehend simple concepts, votes or discussions during deliberations]; *People* v. *Thomas* (1994) 26 Cal.App.4th 1328 [32 Cal.Rptr.2d 177] [juror refused to deliberate]; *People* v. *Halsey* (1993) 12 Cal.App.4th 885 [16 Cal.Rptr.2d 47] [juror misconduct].)

The record clearly establishes the trial court's erroneous instruction was prejudicial. It prevented the jury from exercising their community conscience and power to return a second degree murder conviction as they obviously wanted to do. Accordingly, I would reverse the judgment of conviction and remand for new trial.

On December 2, 1997, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 18, 1998. Mosk, J., was of the opinion that the petition should be granted.