Filed 12/10/13  P. v. Carney CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTIAN WILLIAM CARNEY,<br><br>    Defendant and Appellant. | G046634<br><br>(Super. Ct. No. 08ZF0022)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Law Offices of William J. Kopeny and William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christian William Carney of first degree murder, making criminal threats, and attempting to dissuade a witness. It found not true allegations Carney personally and intentionally discharged a firearm. The trial court sentenced Carney to a total term of 28 years and eight months to life.

Carney asserts the trial court committed prejudicial evidentiary error by permitting the prosecution to introduce gang-related evidence and allowing a pathologist who did not perform the autopsy to testify about the cause and manner of death. We conclude the admission of gang-related evidence in this case does not constitute reversible error. Furthermore, the California Supreme Court's recent decision in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) is adverse to Carney's argument about the pathologist's testimony. The judgment is therefore affirmed.

FACTS

*The Murder and Carney's Arrest*

During the evening of May 13, 2008, James Kenneally took his dog to an open field near Calle Cordillera in San Clemente. He did not see any other cars in the area when he arrived. While he played with his dog, Kenneally heard what he thought sounded like small caliber gunshots. He did not see anyone, however, and assumed he must have heard fire crackers. A short time later, Kenneally and his dog walked back to his truck. As he drove away, Kenneally noticed a silver, four-door sedan parked on a nearby street.

Curious and concerned, Kenneally turned his truck around and drove back to the parked car. He did not see anyone around the car, but he decided to take a photograph of the car's license plate with his cell phone. Kenneally then made a U-turn. As he passed the car again, Kenneally saw two young men, one black and the other white, walking up a nearby hill. Kenneally, who was a marine staff sergeant himself,

2

thought the two men looked like marines.  They also appeared to be out of breath. Kenneally then saw the silver car speed out of the area.  Kenneally reported the incident to the Orange County Sheriff's Department.

Two days after Kenneally's experience, Geoffrey Donoghue found a body, lying face down in a ditch at the end of Calle Cordillera and called 911.  Orange County Sheriff's deputies found a cell phone on the body, which identified the person as Steven Serrano, a marine stationed at Camp Pendleton.  Serrano's last call from the cell phone had been at 5:25 p.m. on May 13.  He sent his last text message at 6:22 p.m. the same day.  Investigators found four .380-caliber shell casings near the body.  An autopsy revealed Serrano had been shot four times with wounds to his face and back.  Two .380-caliber bullets were recovered from his body.

Carney was arrested on May 22, 2008.  When one of the arresting officers told Carney he was under arrest for Serrano's murder, Carney replied, "'Murder, shit. For a guy I hardly knew.  You should be investigating the sergeant major in two-five.  I heard he assaulted this guy.  That guy is dirty.  He did illegal paperwork on me.'"

*The Prosecution's Case*

Andrew Creagh, an active duty marine stationed at Camp Pendleton and one of Carney's good friends, testified he drove Carney's BMW to and from an Enterprise car rental store on May 9.  Carney rented a silver 2007 Suzuki and told Creagh that he was driving to Texas for the weekend.  According to Creagh, Carney gave him the keys to his room and sold some drugs to Serrano and another marine named Chad Hatch before leaving for Texas.  While Carney was gone, someone broke into his room and stole some money.  When Carney returned, Creagh told him about the break-in, and said he suspected Hatch was the culprit.  Creagh also said Carney told him he shot a gun during the trip to Texas.

3

Ellis Holton, a resident of Dallas, Texas testified he was introduced to Carney and Alvin Lovely, Carney's closest friend and fellow marine, on May 10, 2008 when Carney and Lovely were in Dallas. Carney told Holton he wanted to buy a pistol. Holton had a gun and sold it to Carney for $125.

Cynthia Moore, a friend of Lovely's, spoke to Lovely on May 12 to discuss some social plans for the following day. He asked her to include one of her girlfriends, Asia Smith, on the date because he would be bringing Carney with him. As a joke, she texted him a picture of herself holding a paintball gun. Lovely sent her a picture of himself holding a small, silver gun with the message, "'I also have one.'"

The following day, May 13, at around 5:30 p.m., Moore telephoned Lovely to confirm their date. Carney answered Lovely's phone. He sounded excited and panicked, and he said that Lovely was busy and would call her back later. Carney and Lovely did not show up for their date at the appointed time, but Lovely called Moore at around 10:00 p.m. and said he needed to see her that night. Later, Carney and Lovely appeared at Smith's home by arrangement with Moore. They were driving a silver Suzuki.

Moore noticed Carney had a blue rag tied around his neck. She asked Lovely why he was so adamant about meeting her that night. She even asked, in a joking manner, "'What did you guys do?'" "'Did you guys kill someone?'" When Lovely nodded in the affirmative, Moore asked him if he was serious. According to Moore, Lovely reported that Carney had shot someone in self-defense during an exchange of gunfire. He also asked her to provide an alibi for them for the hours between 4:00 p.m. and 10:00 p.m. that day. Moore refused and Carney became angry. He told Lovely, "'You better talk to your girl.'" Lovely again asked Moore to provide them with an alibi, but she refused. Lovely dropped the subject, and then Moore, Smith, Carney and Lovely went to dinner.

4

Hatch also testified at trial. He said he knew Carney well because they had served together in Iraq. He considered Carney a close friend. He also knew Lovely and Serrano. In 2008, Hatch was abusing cocaine, ecstasy, and alcohol, and Carney became his dealer. On May 9, Carney sold ecstasy to Hatch and Serrano before leaving for Texas. Serrano pointed out that Carney would be in Texas over the weekend, and the two of them devised a plan to break into Carney's room and steal any drugs they found. They executed their plan early the following morning. Although they found no drugs, Hatch and Serrano took $110 from the locker in Carney's room.

On May 13, after Carney and Lovely returned from Texas and Carney had discovered the theft, Carney called Hatch. He demanded immediate repayment of an old drug debt. Hatch explained that he needed to cash a check to make the payment, and Carney offered to drive him someplace to cash the check. When Hatch got into Carney's BMW, he realized Lovely was sitting in the back seat. The three of them drove to a nearby Walmart to cash Hatch's check, and then Carney drove around for a while before he parked off the street in an alley.

When Carney parked his car, Lovely pushed a small semiautomatic gun to the back of Hatch's head. Carney then questioned Hatch about the theft. During the questioning, Lovely told Hatch "he had no problem with putting a cap in [his] head." Carney pulled out a blue rag from his car console and told Hatch, "'Crips stay together. I don't want any blood on me.'" Hatch testified Carney seemed very calm, but Lovely swore at him. Fearful of what his formerly good friend might do, Hatch confessed to the break-in and theft. He also told Carney that Serrano had been with him.

Carney directed Lovely to take Hatch's cell phone and call Serrano. Lovely complied, and he told Serrano he had a new batch of marijuana he wanted Serrano to try. He directed Serrano to meet them on base in a particular parking lot. Once Carney parked his car in the parking lot, Hatch begged to be released and Carney agreed. As Hatch walked back to his barracks, he saw Carney talking to Serrano.

5

Hatch saw Carney the next day. He testified that Carney said Serrano was "gone" and it was "just business." Carney also told Hatch that Serrano's body would be found sooner or later and the police would probably question him, but that Hatch should keep quiet and not say anything. Again, Hatch thought Carney seemed very calm.

Hatch admitted at trial that he lied to police when first questioned about the murder. He explained that he was afraid Lovely would kill him, but he denied being afraid of Carney.

*Defense Case*

Carney testified on his own behalf. He provided detailed testimony about his early life, interest in music, rap music in particular, and experiences playing the bagpipes. He also explained his service in the marines, and the resulting toll his military service had taken on his personal life, including the effect his enlistment had on his marriage. With respect to rap music, Carney testified to his familiarity with several leading rap artists and the lifestyle depicted in rap music videos, i.e., "the money, the cars, the girls." But he claimed rap artists did not really do any of the violent things they rap about, and he said the references to acts of violence were just part of a "performance." Carney also admitted writing rap lyrics, and he acknowledged the subject of his songs was "[a]ll types of violence, drugs, guns, normal gangster rap stuff," including shooting people in "[t]he head, the body, the face."

Carney explained that he met Hatch in the spring of 2007 during his second deployment to Iraq. They became very close friends, and when they returned to the United States, both friends developed substance abuse problems. Hatch abused alcohol and cocaine, and Carney smoked marijuana. Carney lived in a Los Angeles apartment with his wife at the time, and because he needed the money and lived off the base, Carney started supplying Hatch and few other people with drugs.

6

Carney said he met Lovely in January 2008 at a barbeque, and the two struck up a friendship after they discovered their mutual interest in marijuana and rap music. Carney and Lovely had aspirations to become rap music stars, and they spent a great deal of time together smoking marijuana and writing rap lyrics.

In April 2008, Lovely left the base without authorization and went home to Dallas, Texas. When Lovely called Carney, Carney convinced him to return to base. On May 9, Carney rented a car and drove to Dallas to retrieve his friend. Once there, Carney met Lovely's family and friends, and they "checked out" Lovely's "hood." Carney noticed everyone in Lovely's neighborhood wore either all blue or all red, and he thought this might mean they were Crips or Bloods gang members.

During the trip, Lovely introduced Carney to Marchello Lewis. Carney noticed Lovely and Lewis greeted each other with a special handshake, and Carney thought Lewis was affiliated with the Crips gang. Lovely wanted to buy a gun so the three of them drove around the neighborhood asking people if they had a gun to sell. Eventually, they found Holton. Carney testified that Lovely asked him for the money to buy the gun, and Carney gave it to him. Carney was not surprised Lovely wanted a gun. According to Carney, every marine he knew bought, sold, or possessed a gun or guns. Carney said he held the gun, but never fired it. Lovely later got ammunition for the gun from Lewis, and he put the gun and ammunition in the trunk of Carney's rental car, the silver Suzuki.

Carney and Lovely left Dallas on May 11 and returned to Camp Pendleton on the 13th. During the trip, Lovely used Carney's phone to send texts to Moore. Carney and Lovely took a picture of themselves at a 7-Eleven store during the trip home. In the picture, Carney made a "C" sign and wore a blue cap, but he denied being a member of the Crips gang.

Shortly after his return to base, Creagh told Carney someone had broken into his room while he was away, and Carney discovered some of his money had been

7

taken. Carney suspected Hatch of the break-in and theft, and he told Lovely about it. Carney made arrangements to collect Hatch's previous drug debt, and he asked Lovely to go with him because Lovely is intimidating. But he had no idea Lovely would take or use the gun he had just purchased.

Carney drove Hatch and Lovely in his BMW to Walmart so Hatch could cash a check. After Hatch paid Carney, Carney asked him, "'Look, Hatch, I know you broke into my room. Who were you with?'" At this point, Lovely pulled out the gun and jabbed it into Hatch's head. Lovely said to Hatch, "'I'm a Crip. I'm not afraid to cap you.'" Hatch asked Carney what was going on, but Carney, who claimed he was just playing along with Lovely, pulled out a blue bandana from his center console and said, "Don't look at me, Hatch. Don't look at me for help. Me and Lovely roll together."

Hatch started to cry. He admitted breaking into Carney's room and that Serrano had been with him. Carney, surprised at Hatch's response, drove back to the base. After they arrived, Lovely used Hatch's phone to call Serrano. Lovely told Serrano, "'Hey, we have some new pot[,]'" and he asked Serrano if he wanted to try it. Lovely then grabbed Carney's cell phone, and he told Hatch that he had entered Hatch's father's phone number into Carney's phone for future use if necessary. But Carney claimed he never found any evidence Lovely had actually done so. Nevertheless, Lovely told Hatch to keep quiet or he would "'come after'" his family.

Carney and Lovely let Hatch go while they were waiting for Serrano to join them, and he knew Hatch was "shaken up" so he tried to reassure him. While Carney attempted to calm Hatch, Lovely jumped out of Carney's BMW and got into the silver Suzuki rental car. When Serrano arrived, he and Carney got into the rental car with Lovely. Carney testified that he had completely forgotten about the gun Lovely used to threaten Hatch.

Carney then drove the rental car to a cul-de-sac near a field on Calle Cordillera. He noticed a truck parked in the cul-de-sac. The truck had a Marine Corps

8

decal on it, but the driver was nowhere to be seen.  Carney, Lovely, and Serrano got out of Carney's rental car and walked up a hill to a drainage ditch.

Carney testified the plan was to punish Serrano for the theft by smoking marijuana in front of him and not sharing.  Carney gave Serrano the keys to the rental car because he knew Serrano would not be under the influence of marijuana when they decided to drive back to the base.  Carney sat down with Serrano while Lovely stood in front of them.  Carney had just started to roll a marijuana cigar when Lovely pulled out the gun.  Carney said before he could react, Lovely pointed the gun at Serrano's face, and said, "'Look, dawg, I know you took my homeboy's money.'"  Carney testified Serrano laughed at Lovely, and then Lovely just shot him in the face.

Carney said he jumped to the other side of the ditch and ran as Lovely fired multiple shots into Serrano's back.  Lovely ran after him, and together they ran to the rental car.  Carney could not find the keys however, and it was only while he and Lovely exchanged words and looked for the keys all around the car that he remembered Serrano had the keys.  Carney ran back up the Hill to Serrano.  He checked Serrano for a pulse, but soon realized Serrano was dead.  Once he found the car keys, Carney ran back to the rental car and gave the keys to Lovely.

As Lovely drove south on the 5 freeway, Carney thought he looked relatively calm.  Lovely used Carney's phone to call Lewis for advice on what to do.  He also called Moore in an attempt to arrange for an alibi.  Lovely stopped long enough to dispose the gun and box of ammunition before they continued south to San Diego.  In San Diego, they bought some new clothes and changed at a gas station before driving to Smith's home in Hemet.

After they arrived at Smith's house, Lovely and Moore had a conversation, but Carney could not hear them.  Then, he, Lovely, Smith, and Moore went to dinner.  A couple of days later, Carney told Hatch that Serrano was "gone."  He also told Hatch not

9

to say anything about what happened and to "stay out of it completely," although he denied that his statement was intended as a threat.

For the next few days, Carney said he tried to act as if nothing had happened. Then he decided to go to his Los Angeles apartment and take Lovely with him. A couple of days later, Lovely left for Dallas using a bus ticket Carney purchased for him under a fake name. Carney did maintain his regular schedule for a few days, but was soon arrested.

## DISCUSSION

Under the prosecution's theory of the case, either Carney fired the gun, or he aided and abetted Lovely in the murder of Serrano, or he aided and abetted Lovely in making or attempting a criminal threat, the natural and probable consequence of which was Serrano's death. In essence, the prosecution argued Serrano was killed during the commission of an execution style shooting over the break-in and theft from Carney's room, and after the murder, Carney threatened to kill or severely injure Hatch to keep him from testifying. The prosecution did not charge either active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)) or committing a crime "for the benefit of, at the direction of, or in association with any criminal street gang." (Pen. Code, § 186.22, subd. (b)(1)).

*Evidentiary Errors*

### a. Gang Evidence

Carney moved pretrial to exclude lay opinion testimony about gang membership and gang signs, and to generally limit the admission of gang evidence, including the photograph Carney and Lovely had taken of themselves during the drive back from Dallas, Texas. The prosecution sought to introduce testimony concerning any

10

affiliation Carney had to a gang. In particular, the prosecution sought to admit testimony by Moore and Hatch about Carney's claim to being a Crip gang member and his possession of a blue bandana.

Ultimately, the court decided Hatch's testimony was relevant to the charged offense of making criminal threats. With respect to Moore, her testimony was limited to her observation of Carney's blue bandana. Her perception of his gang affiliation and related statements were deemed irrelevant. The court also decided the photograph Carney and Lovely took during their trip back from Dallas merely depicted "them as they were at the time," and was not unduly prejudicial.

Rap lyrics did not become an issue until after Carney decided to testify. During his direct examination, defense counsel introduced pictures of a young Carney playing bagpipes. As the trial court later observed, Carney's testimony portrayed him as a "little choir boy that happens to like rap music." The prosecutor then sought to challenge Carney's credibility by questioning him further on his attempts to emulate rap artists. The trial court ruled the evidence was relevant to Carney's state of mind.

During the cross-examination, Carney admitted he might have said, "'I'd rather burn in hell than lose respect for my name[,]'" and he "may have" written something about never using the same gun. Defense counsel clarified on redirect that the two statements mentioned by the prosecutor were in fact rap lyrics written by Carney.[1] Carney ultimately admitted writing rap lyrics, but he claimed they were not related to his own life and were "just fantasy stuff."

On appeal, Carney asserts the trial court committed reversible error by admitting four items of gang-related evidence: (1) Hatch's testimony Carney pulled out a blue rag and said something about this is how Crips stay together; (2) the photograph of Carney and Lovely Had taken during the drive back from Dallas; (3) Hatch and Moore's

---

[1] Although Carney apparently kept a notebook of rap songs, there is no evidence this notebook, or any part of the notebook, were admitted into evidence.

testimony that Carney wore the blue bandana; and (4) permitting the prosecutor to cross-examine Carney concerning the violent rap lyrics he had written.

Citing Evidence Code sections 1101 and 352, Carney asserts this evidence was irrelevant to the charges and more prejudicial than probative. As to the issue of prejudice, Carney does not base his appeal solely on the argument the trial court's ruling admitting these items of evidence violated rules of evidence and prejudiced the verdict under state law, which we examine under the "reasonably probable" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. He also claims the erroneous admission of this evidence was so serious as to violate his federal constitutional right to due process, thus rendering his trial fundamentally unfair. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439.) We disagree with Carney's assertion of error, but regardless of whether or not the trial court's admission of gang-related evidence constitutes evidentiary error, it was harmless beyond a reasonable doubt in this case.

As has been repeatedly stated, California courts have long recognized the potentially prejudicial effect of gang membership. The court in *People v. Perez* (1981) 114 Cal.App.3d 470 observed, "it is fair to say that when the word 'gang' is used in Los Angeles County, one does not have visions of the characters from 'Our Little Gang' series. The word 'gang' . . . connotes opprobrious implications. . . ." (*Id.* at p. 479.) Generally, such evidence is highly inflammatory, and the California Supreme Court has condemned the introduction of such evidence if it is only *tangentially* relevant to the charged offenses. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1046-1047; *People v. Cox* (1991) 53 Cal.3d 618, 660.) Consequently, "[g]ang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) But gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the

12

evidence outweighs its prejudicial effect.  (*People v. Williams* (1997) 16 Cal.4th 153, 193.)

As the Attorney General points out, in addition to the elements of first degree murder, the prosecution had the burden to prove the elements of the crime of making criminal threats.  (Pen. Code, § 422.)  To obtain a conviction for making criminal threats, the prosecution had to prove Carney, (1) "'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,'" (2) "made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,'" (3) the threat was "'on its face and under the circumstances in which it [was] made,  . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,'" (4) "the threat actually caused the person threatened 'to be in sustained fear for his or her own safety. . . ,'" and (5) "the threatened person's fear was 'reasonabl[e]' under the circumstances.  [Citation.]"  (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)  Thus, Carney and Hatch's mental states and the reasons for them were relevant to at least one of the charged crimes.

In addition, the elements of intimidating a witness (Pen. Code, § 136.1, subd. (a)(2)) include maliciously and intentionally attempting to prevent or discourage a witness to crime from "attending or giving testimony at any trial, proceeding, or inquiry authorized by law."  Thus, Carney's intent, Hatch's fear of what Carney might do after Serrano was killed, and whether Hatch initially lied to police for fear of participating in the prosecution of Carney, were all put at issue by Carney's not guilty plea to this charge.

Furthermore, just because gang-related evidence may not be used to demonstrate a defendant's propensity to commit a violent crime (Evid. Code, § 1101, subd. (a)) does not mean such evidence is wholly irrelevant to a testifying defendant's credibility.  (*People v. Cooper* (1991) 53 Cal.3d 771, 822.)  As the trial court noted, Carney's credibility was placed at issue by his decision to testify with the result that

evidence otherwise arguably marginally relevant became somewhat more so. For these reasons, we find the trial court did not abuse its discretion by admitting evidence that while either a gun was held to Hatch's head, Carney pulled a blue rag out of his car's center console and said "this is how Crips, we stay together." The same is true for the photograph of Carney making a "C" with his hands at a stop during the drive back from Dallas, Moore's testimony that Carney wore a blue bandana on the night of the murder, and the prosecutor's brief cross-examination of Carney concerning the violent rap lyrics he had written.

But even assuming the minimal references to Carney's blue bandana, statements about the Crips, and the gang lifestyle as portrayed by rap music lyrics were only marginally relevant to the crimes alleged and the trial court violated state evidentiary law by admitting them, the prejudice caused here was minimal. Under state law, the erroneous admission of evidence results in a reversal *only* when a proper objection is made, which is the case here, *and* the reviewing court "is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

We have already found no abuse of the court's discretion, and further conclude there is no miscarriage of justice. As stated, the gang evidence was minimal, especially when compared to the evidence of Carney's guilt. He essentially admitted the elements of the crimes, but contended Lovely did the dirty work and he lacked the requisite intent for the crimes. But the evidence at trial convinces us Carney was more than an innocent bystander even assuming Lovely fired the lethal shots and used the gun to threaten Hatch.

Finally, with respect to Carney's federal due process claim, "the admission of evidence, even if error under state law, violates due process only if it makes the *trial*

14

*fundamentally unfair."* (*People v. Partida, supra,* 37 Cal.4th at p. 435, italics added.)[2] To prove a deprivation of federal due process rights, Carney bears the burden of demonstrating such fundamentally unfairness. (*Estelle v. McGuire, supra,* 502 U.S. at p. 70; *Jammal v. Van de Kamp* (1991) 926 F.2d 918, 920.) Here, the admission of testimony concerning Carney's gang-related statements, photograph, and bandana, and statements made during cross-examination concerning his desire to emulate the lifestyle depicted by rap music, did not render Carney's trial fundamentally unfair. In seven days of testimony, including Carney's lengthy and self-serving self-portrait and negative presentation of Lovely's involvement, the few references to Crips and Bloods, red and blue, a blue bandana, some statements related to it, a single photograph, and two lines of rap lyrics, pale in comparison to Hatch's recollection of his harrowing experience with Carney and Lovely and Carney's cavalier attitude toward Serrano's death.

Moreover, Carney admitted being present during the terrorization of Hatch and the murder of Serrano. His sole defense was to shift the blame and responsibility for these events on Lovely. Thus, considering the totality of the testimony against Carney and the relative insignificance of the gang-related evidence, we conclude Carney received a fair trial, not a trial so fundamentally unfair as to impinge on his right to due process of law. This is simply not a case that presents one of those rare and unusual occasions where the admission of evidence has violated federal due process.

### b. Crawford Error

At trial and on appeal, Carney argued the trial court erred by allowing a pathologist who was not present at Serrano's autopsy to testify, based on the autopsy

---

[2] It appears Carney did not object on grounds the admission of gang-related evidence violated his federal constitutional right to due process. Nonetheless, under *Partida*, this claim is subsumed within his Evidence Code section 352 objection, and thus he has preserved the issue for appeal. (*People v. Partida, supra,* 37 Cal.4th at p. 435.)

15

report and photographs, regarding the cause of death as well as the condition of the body. While this appeal was pending, the California Supreme Court decided in *Dungo, supra,* 55 Cal.4th 608. *Dungo* is on point and controlling here.

In *Dungo,* the autopsy of a murder victim had been performed by Dr. Bolduc, but the prosecution called Dr. Lawrence, who testified that, in his opinion, based on the autopsy report and the accompanying photographs, the victim had died as a result of strangulation. Dr. Lawrence also testified to certain conditions of the victim's body, as set forth in the autopsy report and/or the photographs, which supported his conclusion. Finally, based on the finding in the autopsy report that the victim's hyoid bone was not fractured, Dr. Lawrence opined the strangulation lasted for at least two minutes. (*Dungo, supra,* 55 Cal.4th at p. 614.) The autopsy report itself was not admitted into evidence. (*Id.* at p. 615.)

The California Supreme Court held the factual information in the autopsy report regarding the condition of the body was not testimonial and therefore its admission into evidence did not violate the defendant's Sixth Amendment right to confront adverse witnesses. (*Dungo, supra,* 55 Cal.4th at pp. 619-621.) As the court observed, "testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Id.* at p. 619.) The court concluded the observations about the condition of the body, as opposed to any conclusions based on those observations, do not constitute testimonial evidence. (*Id.* at pp. 619-620.) Rather, "[t]hey are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial . . . ." (*Ibid.,* fn. omitted.)

Here, the autopsy report was not admitted at trial. Nor did the testifying pathologist simply relay the findings of the pathologist who performed the autopsy.

16

Rather, the pathologist at trial stated he reached his own conclusions based on the objective facts contained in the report prepared by his colleague.

Carney points to the dissent in *Dungo*, and inapt decisions by the United States Supreme Court and those of courts in other states, to assert *Dungo* is wrongly decided. As a Court of Appeal, we are bound by the California Supreme Court's determination of the issue. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *People v. Birks* (1998) 19 Cal.4th 108, 116, fn. 6 [state Court of Appeal has no authority to overrule decision of state Supreme Court].) Moreover, the California Supreme Court recently affirmed its *Dungo* analysis and conclusion in *People v. Edwards* (2013) 57 Cal.4th 658. Thus, under relevant California law interpreting the federal Constitution's confrontation clause, the trial court did not err by allowing one pathologist to testify to about his own conclusions of the cause and manner of death based on a report prepared by another pathologist.

Furthermore, even assuming error, it is harmless beyond a reasonable doubt in this case. (See *People v. Pearson* (2013) 56 Cal.4th 393, 463-464.) Carney did not contest the method and manner of Serrano's death. He merely argued he did not shoot Serrano and had no idea Lovely had a loaded gun and would use it. Moreover, the prosecution's case amply support's the jury's determination Carney aided and abetted Lovely in the murder of Serrano, made a criminal threat to Hatch, and tried to dissuade Hatch from testifying. Consequently, there is no basis for reversal of the judgment because Carney did not have the opportunity to cross-examine the pathologist who actually performed the autopsy.

17

DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

ARONSON, ACTING P. J.

FYBEL, J.