Filed 2/7/14  P. v. Miles CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLES R. MILES,<br><br>Defendant and Appellant. | A134877<br><br>(Contra Costa County<br>Super. Ct. No. 05-08-07883) |

Jason Coca died after being shot six times at a 2007 Halloween party in Pinole, California by defendant Charles R. Miles.  Miles was charged with the murder of Coca (Pen. Code, § 187),[1] being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and participation in a criminal street gang (§ 186.22, subd. (a)).  The indictment against Miles also alleged firearms and criminal street gang enhancements (§§ 12022.53, subds. (b), (c), (d), (e)(1); 186.22, subd. (b)(1).)

The prosecution's theory was that Miles, a member of the Norteño street gang, shot Coca in retaliation for Coca's earlier shooting of a fellow Norteño gang member.  Miles ultimately acknowledged shooting Coca, but claimed the shooting was in self-defense.  A jury found Miles guilty on all counts and found the murder to be in the first degree.

On appeal, Miles does not contend that the evidence was insufficient to support his conviction.  Rather, he contends that he was prejudiced, individually and cumulatively,

---

[1] Statutory references are to the Penal Code, unless otherwise indicated.

1

by four errors at his trial: (1) the court abused its discretion by admitting into evidence a statement made at the earlier shooting of another Norteño gang member; (2) the prosecution violated its discovery obligations by revealing that statement, and the witness who would testify to the statement, while trial was underway; (3) some provisions of CALCRIM No. 1403, with which the court instructed the jury, were not supported by sufficient evidence; and (4) the court erroneously allowed an expert witness to testify about the intent of a hypothetical Norteño in a hypothetical situation.

We find no merit in Miles's assertions of error and affirm, without the need to examine Miles's claims of prejudice.

## BACKGROUND

### I. *Procedural Background*

On July 1, 2008, the Contra Costa County Grand Jury returned an 11-count indictment against Miles and Patrick Joseph Botello. Counts 1 through 4 of the indictment charged Miles and Botello with the murder of Dominic Porter (§ 187), the attempted murder of Marquez Pierce (§§ 187, subd. (a), 664, subd. (a)), shooting into an inhabited dwelling (§ 246), all allegedly committed on August 1, 2007, and participation in a criminal street gang (§ 186.22, subd. (a)), with various gang and firearm enhancements attendant to counts 1 through 3. In connection with these charges, Miles alone was charged in count 6 with being a felon in possession of a firearm (§ 12021, subd. (a)(1)) and in count 11 with being a felon in possession of ammunition (§ 12316, subd. (b)(1)).

Counts 5, 7, and 8 were alleged to have been committed on October 31, 2007. These counts charged Miles alone with the murder of Coca (§ 187), being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and participation in a criminal street gang (§ 186.22, subd. (a)). Attendant on count 5, the indictment charged firearm enhancements. (§ 12022.53, subds. (b), (c), (d), (e)(1).) Attendant on counts 5 and 7, the indictment charged a criminal street gang enhancement. (§ 186.22, subd. (b)(1).)

Counts 9 and 10 charged Botello alone with assault with a deadly weapon (§ 245, subd. (a)) and dissuading a witness (§ 136.1, subd. (a)(1)).

2

The trial court granted severance of counts and ordered three trials: (1) a joint trial on counts 1 through 4, 6, and 11 (the Porter murder trial); (2) a trial of Miles alone on the three counts (5, 7, and 8) arising from the Coca murder, the case at issue in this appeal; and (3) a separate trial of Botello on counts 9 and 10. On March 24, 2010, a jury in the Porter murder trial convicted Botello on counts 1 through 4, but acquitted Miles on all counts except count 11 (felon in possession of ammunition), which was renumbered as count 5 for trial. Count 6 (renumbered to count 7, felon in possession of a firearm) was not submitted to the jury, and the court subsequently dismissed it on the People's motion.

For the separate trial of Miles, original counts 5, 7, and 8 were renumbered as counts 6, 8, and 9. Trial began on April 14, 2010, but the court declared a mistrial on April 20 after Miles's counsel declared a conflict of interest

A new trial began on October 17, 2011. On November 8, 2011, the jury returned a verdict of guilty on all counts. The jury found the murder to be in the first degree and the firearm and criminal street gang enhancements to be true.

At a hearing on February 10, 2012, the court denied Miles's motion for a new trial and a motion, made pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, to replace his appointed counsel. The court then sentenced Miles to state prison for a total term of 58 years and eight months to life, structured as follows: 25 years to life for murder, 25 years to life for the firearm enhancement attendant to the murder, four years for the gang enhancement attendant to the murder, three years for being a felon in possession of a firearm, eight months for being a felon in possession of ammunition (the count on which Miles had been found guilty in the joint trial with Botello), and one year for a felony assault to which Miles had pleaded guilty on a different docket.

Miles filed a timely notice of appeal on February 10, 2012.

## II. *Factual Background* [2]

### A. *The January 2007 Shooting of Botello*

We briefly describe a shooting in January 2007 because of Miles's claims of error concerning the admission of a statement made by Botello. At that time, Daryl England was one of the police officers who responded to the shooting in which Botello and Fernando Salguera were wounded outside the J & A Market in El Sobrante, California. Botello had gunshot wounds in both legs and Salguera had two wounds in the back. Harold Arroliga, a friend of Salguera's brother, Kenneth Salguera (Kenneth), was at the scene. England testified at triak that about 15 to 20 minutes after he arrived at the scene of the shooting, as Botello was put on a gurney and loaded into an ambulance, Botello yelled, "Don't talk to the police. We'll take care of this ourselves."

### B. *The Shooting of Coca*

On October 31, 2007, more than 50 people, including Coca, attended a Halloween party at a Pinole, California, residence. Arroliga was at the party and when he saw Coca, he called Kenneth. Arroliga told Kenneth that he should come to the party, and that the person who shot his brother was there. Kenneth was already on his way to the party when Arroliga called him. Miles was with Kenneth, in Kenneth's truck, when Arroliga called Kenneth.

About 11:00 p.m., fights broke out and the partygoers went outside into the street. Coca was challenging "everybody that was there," including Joey Bonnett, an acquaintance of Miles. Arroliga believed the argument between Coca and Bonnett to have been about the January shooting. Bonnett and Kenneth saw Coca gesture as if reaching for a gun, but no one actually saw a gun. Within 15 seconds of making such a gesture, according to Kenneth, "someone" shot Coca multiple times.[3]

Police officers responded about 11:50 p.m. Coca was already dead. The doctor who performed the autopsy of Coca testified that the body had six gunshot wounds.

---

[2] We do not review the facts of the Porter murder trial, at which Miles and Botello were co-defendants, because they are not at issue in this appeal.

[3] At trial, none of the prosecution witnesses identified Miles as the shooter.

Miles testified on his own behalf as the sole defense witness. He went to the Halloween party with Kenneth and carried a handgun with him. Miles knew Coca and believed him to be the person who had shot Botello and Salguera in January 2007.

According to Miles, Coca reached as if he was "going to pull out a gun" and Miles "got scared." Coca's hand was behind him and Miles could not see if he was holding a gun. Thinking that Coca was going to shoot him, Miles drew his own gun and began firing at Coca from about 10 feet away.

Miles left the scene with Kenneth and eventually went to Kenneth's house. Bonnett and Arroliga also came there. Miles told them not to talk with anyone about the shooting. Miles later told people to say he had not been at the party.

## C. *Gang-Related Evidence*

Jeff Palmieri testified as an expert in the area of criminal street gangs and believed that both Miles and Botello were Norteños who belonged to Varrio San Pablo (VSP), a Norteño subgroup. Miles had tattoos on his arms, hands, neck, and face signifying Norteño membership. The tattoos included several variations of the number 14 (associated with "N," the fourteenth letter of the alphabet), a Huelga bird, the letters VSP, and the letters EBN (East Bay Norteño). A copy of the "14 Bonds," the Norteño training manual containing the rules that "they live by," was found in the search of Miles's bedroom. Much of the clothing found in Miles's bedroom was red, the color worn by Norteños.

Palmieri testified that the Norteños are a gang engaged in criminal activity, including murder, assault, drug dealing, and illegal possession of firearms. Palmieri believed that Botello's conviction for the murder of Porter was part of a pattern of Norteño criminal activity, as was Miles's conviction for assault with a deadly weapon committed in San Pablo, California in July 2006. If a member of a Norteño subgroup is assaulted, the other members will find out about it.

Palmieri was presented with the following hypothetical set of facts: a Norteño wearing jeans with red in them came to a party knowing there was a person at the party whom the Norteño believed had shot another Norteño; the Norteño intervened as the

5

person was about to fight someone else; the Norteño shot the person six times in front of a crowd; and a red bandana was found in the street. Palmieri testified that such a crime would be for the benefit of the Norteños and would promote their criminal conduct. Palmieri said he would reach the same conclusion even if the Norteño happened upon the other person at the party without knowing ahead of time that he was going to be there. Palmieri stated that gang members often attack rivals when they encounter them by chance.

Miles was arrested on November 7, 2007, and Police Officer Mike Pistello interviewed him. Miles told Pistello that he had been in San Francisco at the time Coca was shot. He said that he had heard about the shooting from "his little homies" and believed that Coca had been shot because Coca had shot Botello.

Miles acknowledged that he and Botello were Norteños. He denied telling the police after his arrest that he had heard Coca was shot because Coca had shot Botello.

## DISCUSSION

### I. *Botello's Statement at the January 2007 Shooting*

As noted above, England testified that after Botello and Salguera were shot in January 2007, Botello shouted out: "Don't talk to the police. We'll take care of this ourselves." Miles contends that it was error for the court to allow this statement to be admitted into evidence and that he was prejudiced by that error.

### A. *Background*

On October 27, 2011, while the prosecution case was in progress, the prosecutor disclosed that he intended to introduce testimony by England concerning Botello's January 2007 statement.

Defense counsel made several objections: (1) the statement was hearsay; (2) the statement was irrelevant because Botello's intent could not be imputed to Miles, there being no evidence that Miles heard the statement or that Botello ever conveyed it to Miles; (3) in an Evidence Code section 352 analysis, the statement would be very prejudicial to Miles; (4) the defense was prejudicially disadvantaged by this sudden revelation because of lack of opportunity to investigate; and (5) there was insufficient

6

foundation for England to testify as to whether Botello was "under the stress of the moment" when he made the statement.

The court ruled that Botello's statement would be admissible under Evidence Code section 1240 because "[i]t does explain a condition perceived by the declarant at the time, which is that he was in a situation where he didn't want anybody but himself and his gang to take care of the problem. It was also made spontaneously under the stress of excitement caused by the perception that he didn't want that because he'd just been shot. So, I do think it fits within the spontaneous statement exception." The court also stated that it believed the statement would be admissible under Evidence Code section 1250.

## B. *Admissibility under Evidence Code section 1250*

Evidence Code section 1250, subdivision (a), provides, in relevant part: "Subject to [Evidence Code] Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." Evidence Code section 1252 in turn provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence . . . ." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

Miles argues that Botello's statement was not admissible under Evidence Code section 1250 because Botello's state of mind was not an issue in the case.[4] However, the

---

[4] Miles also contends that the People have waived any argument that Botello's statement was admissible under Evidence Code section 1250 because they did not present section 1250 as a ground for admitting the statement to the trial court. Miles cites *People v. Hines* (1997) 15 Cal.4th 997, 1034, fn. 4, and *Lorenzana v. Superior Court* (1973) 9

7

trial court explained at the hearing why Botello's state of mind was at issue: "With respect to whether . . . Botello's intent can be imputed to Miles, that's exactly what the issue is here in this gang case. . . . I think that the fact of [Miles's] possession of the 14 Bonds and the closeness of his relationship with Botello, and the fact that when . . . Botello—in the wake of . . . Botello's shooting at the earlier party in the summer, he went to [Miles's] home after that. And the fact that . . . Arroliga called Salguera and said, Hey, the guy who shot your brother is here, and the expectation, at least imputed—impliedly that something be done about that, but that all of that together, I think leads to a reasonable inference that this was done for the purpose of the gang. [¶] And I think it is a fair inference from the evidence that because the closeness of their relationship and [Miles's] adherence to the principles of the gang, based on the 14 Bonds and other evidence I expect Detective Palmieri is going to put in, that there's a sufficient inference that this was the motive. And it was done for the purpose of the gang. [¶] So, it's certainly relevant. And I think it's a fair inference, not a necessary inference but a fair inference the jury can make."

In *People v. Riccardi*, the contested statements concerned a decedent's fear of the defendant. (*People v. Riccardi* (2012) 54 Cal.4th 758, 813-814.) The court concluded "that evidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive—but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it." (*Id.* at p. 820.)

This case is similar to *Riccardi*. Botello's direction not to talk to the police because "we" would take care of it was relevant to Miles's motive. Independent,

Cal.3d 626, 640, in support of this contention. However, both cases involved evidence which had been excluded in the trial court and both cases held that the party advocating for admission could not argue on appeal a ground for admission that it had not presented to the trial court. Neither case stands for the proposition that when a trial court determines that evidence is admissible on a ground different from that originally proposed, the party advocating for admission may not argue on appeal that the trial court was correct.

admissible evidence supported a reasonable inference that Miles was aware of Botello's state of mind before he shot Coca and may have been motivated by it. Miles and Botello grew up together and would "hang out" with each other. Both belonged to VSP, a subset of the approximately 35 Norteño gang members in west Contra Costa County. That Miles was an ardent Norteño was demonstrated by his gang tattoos, including one on his face, and the book of gang rules found in his room. Palmieri testified that Norteños would "take some kind of action" if "disrespected," so as not to appear weak. After Coca was shot, Miles told the police that the shooting was in retaliation for the shooting of Botello. Given all of these facts, a trier of fact could reasonably infer that, in the 10 months between the two shootings, Botello communicated to Miles his intent that the Norteños should "take care of this ourselves" and that Miles was motivated by this intent. Such a conclusion would not be, as Miles would have it, "complete speculation."

Botello's state of mind was at issue in this case because it was relevant to establish Miles's motive and independent, admissible evidence supported the reasonable inference that Botello's intent was communicated to Miles and that Miles was motivated by that intent. Accordingly, we find no abuse of discretion in the trial court's conclusion that Botello's statement was admissible under Evidence Code section 1250. We need not address whether the statement was also admissible as a spontaneous statement under Evidence Code section 1240.

**C. *Alleged Discovery Violation***

Miles further claims that the court erred in admitting Botello's statement because failure to disclose the statement before trial "violated [Miles's] statutory discovery rights under [section] 1054.1" and "also violated [Miles's] 5th and 14th Amendment due process rights to notice."

We disagree that the prosecution was guilty of a discovery violation. Section 1054.1 requires a prosecuting attorney to disclose the names and addresses of all persons he or she intends to call as witnesses at trial. Section 1054.7 provides: "The disclosures required under this chapter shall be made at least 30 days prior to the trial . . . . If the

9

material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ."

The prosecutor learned of Botello's statement on the same day that defense counsel was informed of the statement and the court held a hearing on its admissibility. Miles's counsel expressed "100 percent confidence" in the prosecutor's good faith. Because the facts to which England would testify were not known to the prosecutor 30 days before trial and were promptly conveyed to defense counsel, there was no violation of California discovery requirements.

Miles cites no case suggesting that the disclosure of incriminating information or identification of a witness during the course of a trial constitutes a violation of due process. The one case that Miles does cite, *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, has nothing to do with the disclosure of incriminating information or the identity of witnesses. As the United States Supreme Court has stated: "There is no general constitutional right to discovery in a criminal case, and [*Brady v. Maryland* (1963) 373 U.S. 83] did not create one; as the Court wrote recently, 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . .' " (*Weatherford v. Bursey* (1977) 429 U.S. 545, 559, quoting *Wardius v. Oregon* (1973) 412 U.S. 470, 474.)

There having been no discovery or due process violation, we are left with the court's decision to admit Botello's statement despite Miles's objection that the defense was prejudicially disadvantaged by a lack of opportunity to investigate. As with other determinations concerning the admission of evidence, we review this issue for abuse of discretion. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724.)

Miles asserts that his case was prejudiced by the late disclosure because "[i]f timely disclosure had been furnished, defense counsel would have had time to investigate and interview Fernando Salguera and the paramedics [who attended to Botello]. That investigation probably would have shown that Botello was talking with many people, which would have shown that he was not under the stress necessary for a spontaneous statement." This assertion of prejudice is rank speculation and, in any case, irrelevant

10

because we have concluded that Botello's statement was admissible under Evidence Code 1250, whether or not it was admissible as a spontaneous statement.

The court directly addressed the opportunity to interview paramedics as follows: "And as to the ambulance drivers, you certainly could see if you could find them. My guess is that they will have absolutely no recollection because none of it would have mattered to them. They wouldn't really care what somebody said when they're getting into the ambulance. They care about what the person's condition is and can they keep him stable until they get to the hospital. And my guess is, from an incident that happened back in 2007, four years ago, almost to the day, the likelihood that they would remember something significant is very, very small. So I don't see that there's any real prejudice of letting this in at this point."

Further, the trial court offered defense counsel the opportunity to interview Arroliga, who was present at the shooting of Botello and Salguera, in an Evidence Code section 402 hearing, to determine what he could offer about the circumstances of Botello's statement.[5] The court also offered "to sign a removal order" and "bring [Botello] here" to testify about the circumstances of his statement.[6] Defense counsel did not follow up on either of the court's offers to mitigate the lack of prior opportunity for investigation. Nor did defense counsel request a continuance to locate and interview the paramedics and Salguera.

We discern no abuse of discretion by the trial court in how it dealt with Miles's assertions of prejudice because the late disclosure provided no opportunity to investigate. Miles cannot now credibly claim that he was prejudiced by the late disclosure and

---

[5] During the hearing, the prosecutor confirmed that Arroliga remained under subpoena and was subject to recall.

[6] The court also suggested that defense counsel contact Botello's appellate counsel "to ask whether he'd be willing to let you talk to him" but conceded that he probably would not "because there would be Fifth Amendment issues with respect to any complicity he may have had in this incident." The court finally concluded: "my guess is that there's no way that you're going to get anything from . . . Botello no matter what, whether you brought him here, whether you talk to his counsel."

11

consequent lack of opportunity to interview Salguera and the paramedics when defense counsel showed no interest in interviewing Arroliga, a witness who was available.

## II. *CALCRIM No. 1403*

Miles also contends that there was insufficient evidence to support the jury's use of evidence of gang activity in determining whether Miles actually believed in the need to defend himself or in reaching a conclusion about Miles's credibility generally. We disagree and conclude that sufficient evidence supported the instruction.

The trial court instructed the jury, using CALCRIM No. 1403, as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged; or [¶] The defendant had a motive to commit the crimes charged; or [¶] The defendant actually believed in the need to defend himself. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from the evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

### A. *Credibility*

CALCRIM No. 1403 was at issue in *People v. Samaniego* (2009) 172 Cal.App.4th 1148 (*Samaniego*), cited by Miles. In that case the defendant also contended "that instructing the jury in accordance with CALCRIM No. 1403 was erroneous. He argue[d] that it was improper to allow the jury to consider gang expert testimony as to motive and witness credibility . . . and that such evidence should have been limited to proof of the gang enhancement." (*Id.* at p. 1167.) The defendant argued that the subjects of motive and witness credibility in the instruction "do not apply unless the evidence unique to the case supports them." (*Id.* at p. 1168.)

The *Samaniego* court found that the evidence "supported instructing the jury that it could consider gang evidence on the issue of witness credibility. At trial, several witnesses testified differently than at the preliminary hearing or in prior statements given

12

to police. . . . The disparities in the witnesses' testimony justified use of gang evidence to provide a plausible explanation for them." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1169.)

As with the witnesses in *Samaniego,* Miles's testimony at trial differed from a prior statement made to police. At trial, Miles admitted to shooting Coca, but claimed that the shooting was in self-defense. However, when interviewed by police after his arrest, Miles claimed not to have been present and suggested that Coca had been shot because Coca had shot Botello earlier that year. This discrepancy directly placed Miles's credibility at issue and the evidence of gang activity was relevant to the jury's decision whether to believe that Miles was more forthcoming about motive at the time of his arrest (even while still denying involvement) or at trial. The evidence of gang activity would tend to explain why, even when another explanation for Coca's shooting might have been more advantageous, explanation of the shooting as retribution was the motive that Miles originally suggested.

We find ample justification in the evidence for the jury's use of gang evidence to reach a determination as to Miles's credibility. Miles seeks to distinguish *Samaniego* from his own case because in *Samaniego* it was not the defendant's own credibility that was at issue. However, we find nothing in the reasoning of *Samaniego*, or in other cases that have found gang activity evidence to be relevant on the issue of credibility,[7] that would bar the use of such evidence when the defendant's own credibility is at issue.

## B. *Belief in the Need to Defend*

Miles also contends that there was no evidence supporting the use of evidence of gang activity for the purpose of determining whether he actually believed in the need to defend himself. We find it impossible to separate the questions of Miles's credibility, his

---

[7] *Samaniego* cited *People v. Ayala* (2000) 23 Cal.4th 225, 277, and *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1450, for the proposition that "[g]ang evidence is also relevant on the issue of a witness's credibility." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1168.) Miles discusses both cases to show that it was not the defendant's credibility that was at issue. This is true, but Miles points to nothing in the reasoning of these cases that would not apply to a testifying defendant's own credibility.

13

belief in the need to defend himself, and the actual motive for Miles's shooting of Coca. On the facts of this case, the answer to one of these questions would determine the answers to the others.

The prosecution theory was that the motive for Miles's shooting of Coca was retaliation for Coca's earlier shooting of Botello and Salguera. "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1167.) Evidence of gang activity was relevant and admissible on the issue of motive in this case, as well as on the issue of Miles's credibility, as discussed above. Because the question of whether Miles actually believed in the need to defend himself is inextricably intertwined with the issues of motive and his own credibility, we conclude that there was evidentiary support in this case for the use of evidence of gang activity for the purpose of deciding whether Miles actually believed in the need to defend himself.

### III. *The Hypothetical Question Posed to Palmieri*

Finally, Miles also contends that the trial court erred by allowing Palmieri to state an opinion about Miles's intent. That is not what happened.

### A. *Background*

The prosecutor posed a hypothetical question to Palmieri: "If a Norteño gang member came to a party where he knew a person that he believed had shot another Norteño was present, and found him about to fight another individual, and the Norteño shot the person six times, killing him in front of a crowd of people, while the Norteño was wearing Exhibit 5A,[8] or something similar, and a red bandana was found in the street later . . . , in your opinion, would that Norteño be acting for the benefit of, at the direction of, or in association with the Norteños?." Palmieri answered, "Yes." The prosecutor continued: "And in your opinion, would the Norteño be acting with the intent

---

**8** Exhibit 5A was a pair of black and red Girbaud jeans that police found on the floor of Miles's bedroom in a search of his house on November 8, 2007. A gunshot expert found particles consistent with gunshot residue on the pants and Bonnett testified that the shooter wore pants "something like" exhibit 5A.

14

to promote, further, or assist in criminal conduct by the Norteño gang member?" Defense counsel objected and the court overruled the objection, after which Palmieri answered, "Yes."

Defense counsel renewed his objection and after a discussion, out of the presence of the jury, the court sustained the objection. When the jury returned, the prosecutor returned to the hypothetical and asked additional questions, without objection. The court never told the jury that defense counsel's objection had been sustained and that they should disregard Palmieri's answer concerning the intent of the hypothetical Norteño.

## B. *The Hypothetical Question Posed to Palmieri Was Proper*

"Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a hypothetical question must be rooted in facts shown by the evidence, however." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*).)

"Otherwise admissible expert opinion testimony which embraces the ultimate issue to be decided by the trier of fact is admissible. (Evid. Code, § 805.) This rule, however, does not permit the expert to express any opinion he or she may have. [Citation.] ' "Undoubtedly there is a kind of statement by the witness which amounts to no more than an expression of his general belief as to how the case should be decided . . . . There is no necessity for this kind of evidence; to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witnesses; and in any event it is wholly without value to the trier of fact in reaching a decision." ' " (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 651 (*Killebrew*), disapproved in part in *People v. Vang* (2011) 52 Cal.4th 1038, 1047-1048 (*Vang*).)

Miles relies primarily on *Killebrew* for the proposition that it is not legitimate, even in a hypothetical question, to explore the question of intent. However, in *Vang* the California Supreme Court made it clear that *Killebrew*, while correct in finding that an expert may not testify regarding whether the specific defendant acted for a gang reason, does not place any limitation on hypothetical questions. We quote at length from *Vang*.

15

"We discussed *Killebrew* in *People v. Gonzalez* (2006) 38 Cal.4th 932, (*Gonzalez*). In *Gonzalez,* the defendant argued that testimony by the gang expert (Sergeant Garcia) violated *Killebrew* by expressing an opinion, in response to hypothetical questions, regarding whether some of the witnesses had been intimidated by gang members. We rejected the argument. 'Sergeant Garcia merely answered hypothetical questions based on other evidence the prosecution presented, which is a proper way of presenting expert testimony.' (*Gonzalez, supra,* at p. 946, citing *Gardeley, supra,* 14 Cal.4th at p. 618.) We explained that the 'witness did not express an opinion about whether the particular witnesses in this case had been intimidated. [Citation.] [¶] It is true that Sergeant Garcia's opinion, if found credible, might, together with other evidence, lead the jury to find the witnesses were being intimidated . . . . But this circumstance makes the testimony probative, not inadmissible.' (*Gonzalez, supra,* at p. 947.)[9]

"We explained *Killebrew*'s limited significance. '[*Killebrew*, *supra*, 103 Cal.App.4th 644] is somewhat unclear in this regard. Although its legal discussion states that the expert "informed the jury of his belief of the suspects' knowledge and intent on the night in question," its factual account states that "[t]hrough the use of hypothetical questions, Darbee [the expert] testified that each of the individuals in the three cars" had certain knowledge and intent. (*Id.* at p. 658.) The opinion never specifically states whether or how the expert referred to specific persons, rather than hypothetical persons. Obviously, there is a difference between testifying about specific persons and about hypothetical persons. *It would be incorrect to read* Killebrew *as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons.* As explained in *People v. Gonzalez, supra,* 126 Cal.App.4th at page 1551,

---

[9] "Throughout our discussion, we cited with approval *People v. Gonzalez* [(2005)] 126 Cal.App.4th 1539 (a different *Gonzalez* ), which stated the relevant law and discussed *Killebrew* correctly."

16

footnote 4, *use of hypothetical questions is proper.*' (*Gonzalez, supra,* 38 Cal.4th at p. 946, fn. 3, italics added.)[10]

"To the extent that *Killebrew, supra,* 103 Cal.App.4th 644, was correct in prohibiting expert testimony regarding whether the *specific* defendants acted for a gang reason, [fn. omitted] the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' (Evid. Code, § 805 [citations].) Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' [Citations.]" (*Vang*, *supra*, 52 Cal.4th at pp. 1047-1048.)

*Vang* makes it quite clear that *Killebrew* may not be read to place a limitation on the hypothetical questions placed to an expert witness. While it would have been improper, under *Killebrew*, to question Palmieri about Miles's intent, *Vang* makes clear

---

[10] ". . . [¶] The defendant in *Gonzalez*, *supra*, 38 Cal.4th 932, relied on *Killebrew*, *supra*, 103 Cal.App.4th 644, to argue the trial court had erred in permitting hypothetical questions. We rejected the argument, partly on the basis that it is incorrect to read *Killebrew* as prohibiting the 'questioning of expert witnesses through the use of hypothetical questions.' (*Gonzalez*, *supra*, at p. 946, fn. 3.) The comment in *Gonzalez* in question thus directly responded to the defendant's argument and was necessary to fully explain why that argument lacked merit.

"In any event, we repeat what we said in *Gonzalez*: We disapprove of any interpretation of *Killebrew*, *supra*, 103 Cal.App.4th 644, as barring, or even limiting, the use of hypothetical questions. Even if expert testimony regarding the defendants themselves is improper, the use of hypothetical questions is proper."

17

that asking Palmieri about the intent of a hypothetical Norteño in a hypothetical situation is not the same thing.

Miles counters that "*Vang* allows an expert to answer a hypothetical question as to whether a crime would benefit a gang, or whether the crime would be 'gang-related activity.' That is a different question than whether the defendant, or a hypothetical Norteño, acted with the required specific personal intent." Miles reads *Vang* far too narrowly; *Vang*'s discussion of hypothetical questions and *Killebrew* are not limited to the specific hypothetical questions that were at issue. As *Vang* stated: "We disapprove of any interpretation of *Killebrew* . . . as barring, or even limiting, the use of hypothetical questions." (*Vang*, *supra*, 52 Cal.4th at pp. 1047-1048, fn. 3.)

We conclude that the hypothetical question posed to Palmieri was proper. The court initially overruled defense counsel's objection and there was no abuse of discretion in that ruling. Although the court reversed itself and sustained defense counsel's objection, the jury was not informed. The result, as far as the jury was concerned, was that defense counsel's objection was overruled and Palmieri's answers to the hypothetical questions remained in evidence. There can be no prejudicial error in that result because the question was proper and Palmieri's answer was admissible.[11]

## IV. *Cumulative Error*

Because we have found Miles's assertions of error to have no merit, we need not consider his argument that the cumulative prejudice of the claimed errors requires reversal.

## DISPOSITION

The judgment of the trial court is affirmed.

---

[11] When the prosecutor addressed Miles's specific intent to benefit the gang in closing argument, he did not refer to Palmieri's answer concerning the intent of the hypothetical Norteño. This is an additional indication that Miles was not prejudiced.

_____
Brick, J.*

We concur:


_____
Haerle, Acting P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.