Filed 10/30/15  P. v. Wilson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROBERT E. WILSON,<br><br>        Defendant and Appellant. | A143100<br><br>(Alameda County<br>Super. Ct. No. H55575) |

Robert E. Wilson appeals from a conviction of assault by means of force likely to produce great bodily injury.  He contends he received ineffective assistance of counsel due to his attorney's failure to request a jury instruction limiting consideration of evidence that the victim was threatened during trial to the issue of credibility.  We affirm.

### STATEMENT OF THE CASE

Appellant was charged by information filed on March 17, 2014, with one count of second degree robbery (Pen. Code, § 211) and one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)).  After a jury trial, on August 11, appellant was found not guilty of robbery and guilty of the charged assault.  He was sentenced on September 9 to the middle term of three years.

Appellant filed a timely notice of appeal on September 9, 2014.

### STATEMENT OF FACTS

Zakairyyaa Al-Katib, 19 years old at the time of trial, testified that on the afternoon of February 6, 2014, his cousin Kiin Wood picked him up from Ohlone College in Newark to go to Wood's grandmother's house on Frederick Lane in  Fremont.  Al-

1

Katib sat in the front passenger seat, looking at his iPhone. When they arrived, Wood pulled into a parking spot, then said there was a car pulling up behind them. Two males who were strangers to Al-Katib and later identified as appellant and Jonn Johnson got out of the other car. Johnson punched Wood's window while appellant punched Al-Katib's. Johnson pulled Wood out of the car and began to punch and kick him. Al-Katib got out of the car, leaving his cell phone in the front seat, and went to join the fight in order to help his cousin. Al-Katib was not aware of having problems with anyone at the time, and was not aware of Wood having problems with anyone.

Al-Katib fought with appellant and Wood fought with Johnson about 40 feet away. Al-Katib's fight with appellant lasted about three or four minutes, ending after Al-Katib picked appellant up by his legs and slammed him into the ground, falling on top of him.[1] They both got up and appellant went to Wood's car, grabbed Al-Katib's iPhone, ran to his car and got into the front passenger seat. There was a person in the driver's seat of the silver car. Al-Katib chased appellant and punched his head. Appellant grabbed Al-Katib's hoodie by the "chest" and the car started moving, increasing to 40 miles per hour, dragging Al-Katib down the block with his back and legs touching the ground. When the car made a right turn, Al-Katib was able to get away by ripping his hoodie and slipping free. He landed face-first, splitting his ear.

Al-Katib walked back toward Wood's grandmother's house, wearing only his boxers, which were torn. His ear "was completely off, like literally off." He had road rash on his back, arms and leg, bruises all over his leg, and a "huge" headache. He was taken to the hospital, where he underwent plastic surgery for his ear and received stitches, and was released four or five hours later. Al-Katib testified that his injuries, photographs of which were shown to the jury, all resulted from being dragged by the car.

---

[1] Al-Katib testified that he was "five foot six inches tall and weighed about 140" at the time of the fight. He estimated that appellant was six foot two inches and weighed 200 to 220.

That evening, around 8:00 p.m., police officers came to Wood's grandmother's house. Al-Katib said he would be able to recognize the people involved in the incident. While the police were there, Al-Katib saw that appellant had returned to the house with a group of other men. The police went after them, then returned and took Al-Katib down the block; he was shown two people, one at a time, and identified appellant and Johnson. Al-Katib was 100 percent certain that appellant was the person who grabbed and dragged him.

Al-Katib never got his cell phone back. Later in the evening of February 6, the police showed him what they thought was his phone, but it was not. He acknowledged on cross-examination that he did not see his cell phone in the car where appellant was seated, and that he looked for it outside the house the next day.

Al-Katib also acknowledged that he posted on his Instagram account, " 'I mopped this nigga back to his car,' " " '@gmoney_wett this mark ass nigga from Fremont bruh think he hard because my hoodie got stuck in a car and he had my arm and they took off in a car so I was getting dragged and cut my ear,' " and " '@gmoney_wett, ima hit you a clown he just going to take two ass whipping in one day.' " Asked what he was saying in the third comment, Al-Katib testified, "I told my cousin that I was going to hit him, like I'm going to talk to him, that's what that means. I'm going to hit him up and tell him what happened. Because he didn't know what happened. So I was going to inform him of the incident." The " 'two ass whipping in one day' " referred to Al-Katib's cousin coming to fight appellant. Al-Katib testified that these comments were made on the day of the incident, "out of anger," and were not real threats about injuring appellant.

Al-Katib stated at the outset of his testimony that he did not want to testify and did so under subpoena. The decision to show up was difficult, and he argued about it with his mother, who wanted him to testify. The day before his testimony, as he left court with two of his cousins and his uncle, appellant's mother and girlfriend approached them and said things including that Al-Katib was a "bitch" and a "snitch," " '[s]nitches end up in a grave,' " she " 'knew exactly where she could find me' " and she " 'knew where I got my haircut at.' " They took pictures of Al-Katib and his family, and of their car. Al-

3

Katib returned to the court building and reported the incident. He denied that his uncle told appellant's mother and girlfriend, " 'Fuck you, we're going to merk your bitch ass,' " but acknowledged that his uncle said appellant's mother " 'should have raised [him] correct.' " Appellant was not nearby at the time of this encounter.

Wood testified that he had known appellant for a year or two. Wood, appellant, and Johnson had been friends, and Wood found it difficult to testify against his former friend. Prior to February 6, 2014, problems had developed between Wood and Johnson because Wood "was talking" to Johnson's ex-girlfriend; Johnson would drive by Wood's house every day, throwing "stuff" at the window and doing "stupid stuff." Al-Katib did not know about this, and had not met appellant or Johnson.

Wood described the same basic sequence of events as Al-Katib, but differed on some of the details: Wood testified he did not say anything when he noticed the car behind his after he parked, his estimate of the distance between the two simultaneous fights was about five to six feet, and he said appellant grabbed Al-Katib's hoodie "by the hood." He heard appellant say, "[g]et to the car," and saw appellant run to the car and grab Al-Katib's black iPhone, then get into the other car. Al-Katib ran to the car and "threw a punch through the window, and that's when he got grabbed." Wood saw a hand come out the window and grab Al-Katib's hoodie; the car drove off with Al-Katib facing the opposite way, feet dragging on the ground. He could see Al-Katib struggling to get out of his hoodie. When the car disappeared around the corner, Wood got into his own car and followed, then saw Al-Katib walking back toward him with "none of his clothes on." He helped Al-Katib go back to the house. Al-Katib's injuries were worse than his own; Wood had a hairline fracture to his nose.

Wood spoke with a police officer at the hospital and provided appellant's and Johnson's names and descriptions. Later that evening, the same officer met with Wood and Al-Katib at Wood's grandmother's house, and still later, Wood was taken to see the suspects the police had apprehended. Wood identified Johnson as the person who had punched him in the nose and identified appellant as the person he saw drag Al-Katib.

4

Fremont Police Officer Michael Ramsey testified that he met with Wood at the hospital about 9:45 on the evening of February 6, 2014, then went to the grandmother's house and met with Al-Katib about 11:00 p.m. While they were talking, Al-Katib pointed out two men on the sidewalk and said he thought it was the assailants. Ramsey walked toward the two, who turned and started walking away. One of the men ran and Ramsey chased him, but it turned out he was not involved in the incident. Meanwhile, other officers had stopped three people in a vehicle a short distance away. Ramsey went to the location and saw that two of the men matched the description of the suspects. He asked their names, and they identified themselves as appellant and Johnson. Wood was brought to the scene and identified Johnson as the person he was fighting with and appellant as the person fighting with Al-Katib. Al-Katib identified Johnson as the person fighting Wood and appellant as the person he was fighting, who stole his cell phone and dragged him alongside the car. Appellant and Johnson were arrested and taken to the police department. When they were searched, two LG cell phones were found that looked very similar to the one Al-Katib had reported missing; Ramsey testified that Al-Katib had said he was missing an LG phone. The phones were shown to Al-Katib but he said neither was his. When interviewed by the police, appellant repeatedly denied having been in a fight. The interview was played for the jury.

**Defense**

Appellant testified that on the afternoon of February 6, 2014, he was in a car with Johnson and Rakesh Singh, who was driving, heading from "ShopMart" or "ShopRite" to appellant's cousin's house on Norocco Circle.[2] Appellant saw Wood's car behind them with Wood, Al-Katib, "Dell" and a person he did not know inside; he noticed the car because on several occasions he had observed occupants of the car yelling swear words

---

[2] Appellant referred to these locations as being in Union City. In fact, they are in Newark. The two cities border each other.

out the windows at "everyone." Appellant knew something was about to happen because the car honked and tried to cut his car off for about half a block.

Singh turned into Frederick Lane, a circular "court," to avoid a collision with Wood's car, and stopped with the motor running. Wood pulled in on the driver's side of Singh's car and stopped, and Dell and another male got out of the back seat. Appellant and Johnson got out of their car and the two from Wood's car came up to them, swearing. Dell swung at appellant. Al-Katib got out of Wood's car, and Al-Katib, Dell and the other person started fighting appellant. Wood got out and started fighting with Johnson. Appellant testified that Johnson and Wood had been dating the same girl and were jealous of each other; each had driven by the other's house yelling out the window, and Wood was mad because the girl had gotten back with Johnson.

Appellant thought the fight lasted about five minutes. He was moving around a lot because he was fighting three people. Near the end of the fight, while running between the two cars, appellant dropped his LG cell phone. He picked up his phone and told Al-Katib, who was chasing him, that he would continue to fight if Al-Katib kept trying to fight him. Al-Katib did not come up to him, so appellant walked to Singh's car, which Singh had moved in preparation for leaving, and got into the passenger seat. Appellant denied taking a cell phone or anything out of Wood's car. He had a scraped elbow and his head was throbbing.

After appellant got into the car and put his seatbelt on, as he shut the door, Al-Katib ran up and hit him in the head. Singh started to drive as Al-Katib was hitting appellant. Al-Katib's arm slid off appellant's head and Al-Katib grabbed hold of the seatbelt, which resulted in Al-Katib being dragged along as the car moved. Appellant denied grabbing Al-Katib's hoodie. Once the car had passed about three houses, Al-Katib let go of the seatbelt and "fell off." Appellant and his companions drove to his cousin's house, just a few minutes away.

Sometime after dark that evening, appellant and Johnson left his cousin's house with a friend and were pulled over by the police. Twice, appellant was taken out of a police car and had a spotlight shone on him. He was taken to the Fremont jail and

6

interviewed, the officer trying to get him to admit having started the fight and taken a cell phone. Appellant said he had not been in a fight because he was the victim rather than the aggressor, he did not like being around the police station, and he thought if he said nothing he would be able to go home.

Appellant testified on cross-examination that it was a coincidence that the location Wood's car followed them to was Wood's grandmother's house, saying that the way they were driving was the way he went to his cousin's house. He testified that the others cut them off, explaining that they would not have purposefully turned into a cul-de-sac where they could be "blocked off" because he knew the others had guns and he would not "put his life in danger." Appellant testified that he had seen "them" wave guns in the air "a couple of times," and that once, "he" pulled a gun on appellant. Asked about getting out of the car when he knew the others had guns, appellant said he knew they would not shoot him in broad daylight, that "they don't really shoot guns, they just—they just have them." He acknowledged having given a false name when apprehended for stealing a shirt from Macy's when he was younger, saying he did this because he "had a warrant" and did not want to go to jail.

## DISCUSSION

Appellant contends he was denied effective assistance of counsel by his attorney's failure to request a jury instruction limiting the evidence that Al-Katib was threatened outside the court to the issue of Al-Katib's credibility. He maintains that without a limiting instruction, the jury was free to conclude that appellant authorized the threat, thereby reflecting consciousness of guilt.

" ' " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

7

the outcome." ' " [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' " [Citation.]' (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.) If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876.)

As described above, Al-Katib testified that when he left court the day before his trial testimony, he and his relatives were approached by appellant's mother and girlfriend, who threatened Al-Katib. The prosecution moved to admit evidence of this incident as relevant to Al-Katib's state of mind and credibility. Appellant argued that if this evidence was admitted, there was "substantial evidence" he would have to try to obtain indicating that the threats started with Al-Katib and his family. He pointed to statements by appellant's mother, Hershey, that after the court hearing, while outside the court smoking a cigarette, she saw Stubbs, whom she believed to be Al-Katib's father, yelling at Perez across the street. After a security guard broke up the altercation, Stubbs, who was with Al-Katib, started to yell at Hershey that " '[y]our son is going down' and that 'she should have raised him right.' " Hershey made no threats but told Stubbs he did not know her or her son and how he was raised. Leaving the parking lot, Al-Katib's family "drove by flipping her . . . and Perez off" and yelling " 'Fuck you, we're gong to merk . . . your bitch ass.' " It had not yet been determined whether Hershey and Perez were going to be charged.

8

Appellant argued that the prosecution's proposed evidence raised issues under Evidence Code section 352 because it would have to be determined which family was telling the truth, and witnesses including Hershey, Perez, and Al-Katib's relatives might have to be called. He maintained that if the prosecution was permitted to bring in evidence to bolster Al-Katib's credibility, appellant's right to a fair trial would be denied if he was not able to attack Al-Katib's credibility by showing that his family threatened appellant's first.

The court agreed that litigating whether the threats were justified would be "getting into a 352 situation" and stated that it was "not precluding anything," but that the evidence was being admitted for the limited purpose of giving the jury a factor to use in assessing Al-Katib's credibility and "where that takes us, we don't know. We'll just have to see."

Appellant does not suggest the threat evidence was inadmissible. " ' " 'Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations.] Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.' " ' (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450; see *People v. Gonzalez* (2006) 38 Cal.4th 932, 946 [' "An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court." '].)" (*People v. Williams* (2013) 58 Cal.4th 197, 270.)

The trial court had no sua sponte duty "to give a limiting instruction informing the jurors they could consider the evidence of the witnesses' fear in testifying only in assessing credibility. [The California Supreme Court has] consistently held that where, as here, a defendant fails to request an instruction, a trial court 'generally [has] no duty to instruct on the limited admissibility of evidence. [Citation.]' (*People v. Lang* (1989) 49 Cal.3d 991, 1020; see Evid. Code, § 355 ['When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict

9

the evidence to its proper scope and instruct the jury accordingly.' (Italics added.)].)" (*People v. Valdez* (2012) 55 Cal.4th 82, 139.)

Appellant's attorney did not request a limiting instruction. Appellant contends he received ineffective assistance of counsel because there is no satisfactory explanation for his attorney's failure to request the instruction. We disagree. "[W]hether to seek a limiting instruction is a tactical decision properly left to defense counsel" where the risk of highlighting the evidence in question may outweigh the benefit of the instruction. (*People v. Griggs* (2003) 110 Cal.App.4th 1137, 1141.)

Here, at the outset of his testimony, Al-Katib stated that he was appearing under subpoena and did not want to testify, and briefly described the encounter with appellant's mother and girlfriend. On cross-examination, defense counsel elicited Al-Katib's testimony that appellant was not nearby during the exchange with appellant's mother and girlfriend, and that his uncle had told appellant's mother she should have raised him right, although Al-Katib denied that his uncle had used profanity and told appellant's mother her son was "going down." Defense counsel thus addressed the threat evidence by making clear that appellant was not directly involved in the threat incident, and suggesting there was mutual animosity between the families. The overall defense strategy was to present a version of the fight in which appellant was victim rather than aggressor, and to undermine Al-Katib's version by challenging details of his description and pointing to his Instagram comments suggesting he was the aggressor and the dragging was accidental. Since the case ultimately came down to whether the jury believed Al-Katib and Wood or believed appellant, counsel reasonably could have believed his client's interests would not be served by highlighting at the conclusion of the case evidence that served to bolster Al-Katib's credibility.

Appellant's reliance upon *People v. Hussain* (2014) 231 Cal.App.4th 261 is unavailing. The *Hussain* court found ineffective assistance of counsel where defense counsel in a grand theft prosecution failed to request a jury instruction on claim of right—a good faith belief in the right to property taken from another—as negating criminal intent. (*Id.* at pp. 270-272.) In that case, "[c]laim of right was the *core* of

10

defendant's defense to the grand theft charge" and was the theory argued by the defense; the court concluded "there can be no satisfactory reason not to request an instruction to support the core of the defense." (*Id.* at pp. 270-271.) Unlike *Hussain*, where the instruction was necessary for the jury's understanding of the "heart" of the defense, and there was no potential downside to it being given, here the limiting instruction addressed one factor bearing on witness credibility and could have harmed the defense instead of helping it.

In any event, appellant has not established that he was prejudiced by the absence of a limiting instruction. The premise of appellant's ineffective assistance of counsel argument is that it "would not be unreasonable" for the jury to infer that appellant's family would not threaten Al-Katib if appellant was innocent or if he had not authorized the threats, and therefore to infer that the threats showed appellant's consciousness of guilt. "Not unreasonable," perhaps, but certainly not an obvious inference. We see no basis for the assumption that appellant's mother and girlfriend, encountering his accuser just outside the court on the eve of trial, would express anger and hostility only if previously authorized by appellant.

The threat evidence played a minor role at trial. The testimony concerning the event was brief. The prosecutor mentioned it only briefly in closing argument, and only in the context of an argument focused on Al-Katib's credibility—precisely the purpose for which a limiting instruction would have told the jury it could consider the evidence.[3]

_____

[3] The prosecutor began his argument by portraying Al-Katib as an upstanding, honest young man with no motive to lie, and appellant as a liar with no respect for the court system. As part of this argument, the prosecutor stated, "[Al-Katib] has no reason to lie to you in this case, unlike the defendant. No reason. And, actually, every reason not to go through what he had to go through yesterday. He can't go home without being followed, called a snitch, told he's going to die, have pictures taken of him. 'Snitches get stitches.' " The prosecutor pointed out that Al-Katib had no prior dispute with appellant, then continued, "And he told you all it's his preference, actually, that he not be here. And I'll address that later. [¶] But I ask you to consider it. Consider it in light of the hours of cross-examination he had to go through yesterday, at the preliminary hearing six months ago, and the harassment that he suffered for doing the right thing."

11

The prosecutor made no suggestion that appellant was directly responsible for the threats or that they reflected any consciousness of guilt.

Appellant portrays this as a close case in which "any error posed a high risk of prejudicially influencing the jury's verdict." He points to the fact that the jury had questions about the evidence—it asked to "see the police report for Al-Katib," asked what type of phone the officer testified was reported missing and whether Wood testified that he saw appellant with the phone, and asked for a readback of unspecified testimony—as indicating skepticism over Al-Katib's testimony. And the jury's acquittal on the robbery, he argues, shows the jury disbelieved both appellant and Wood as to their seeing appellant take the phone.

In our view, the fact that the jury found appellant not guilty of robbery says little about its relative assessment of Al-Katib's, Wood's, and appellant's credibility. The jury was required to render a verdict of not guilty unless the prosecution proved the charge beyond a reasonable doubt. The missing phone was never found, and there was a discrepancy between Al-Katib's and Wood's description of it as an iPhone and Ramsey's testimony that the phone reported missing was an LG phone. Appellant testified that at the end of the fight, he dropped his phone and picked it up from the ground by the cars before getting into Singh's car, providing an alternative scenario suggesting Al-Katib and Wood might have misinterpreted what they thought was appellant taking Al-Katib's phone from Wood's car. In short, the jury might have been left with a reasonable doubt on the robbery charge without rejecting Al-Katib's or Wood's credibility.

With respect to the fight, the evidence strongly favored Al-Katib's credibility over appellant's. Aside from the fact that appellant lied to the police repeatedly during the interview following his arrest, disclaiming any involvement in a fight, and was shown to have lied to police on a prior occasion when apprehended for shoplifting, some of the details of his version of the events were simply difficult to accept. As the prosecutor pointed out at trial, it was quite a coincidence that, by appellant's description, he and his companions were "followed" by Wood's car precisely to the cul-de-sac where Wood lived with his grandmother. Appellant's portrayal of Al-Katib as voluntarily holding

12

onto appellant's seatbelt and allowing himself to be dragged to the point of sustaining fairly severe injuries was not particularly plausible. By contrast, while one of Al-Katib's Instagram messages referred to his hoodie getting "stuck in a car"—suggesting an accidental occurrence—the same message said, "and he had my arm and they took off in a car so I was getting dragged and cut my ear." While not identical to his trial testimony that appellant grabbed and held onto his hoodie, the Instagram message was consistent in placing the blame on appellant for holding Al-Katib in the position resulting in his being dragged by the car. We see no reasonable probability that appellant would have achieved a more favorable result at trial if the jury had been instructed that it could consider the threat evidence only for its bearing on Al-Katib's credibility.

## DISPOSITION

The judgment is affirmed.

_____
Kline, P.J.


We concur:


_____
Richman, J.


_____
Stewart, J.

13